FILED

2009 Dec-16  PM 02:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM ERNEST KUENZEL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 1:00-cv-316-IPJ-TMP |
| | ) | |
| RICHARD F. ALLEN, Commissioner of the | ) | |
| Alabama Department of Corrections, and the | ) | |
| ATTORNEY GENERAL OF | ) | |
| THE STATE OF ALABAMA, | ) | |
| | ) | |
| Respondents. | ) | |

## <u>MEMORANDUM OPINION</u>

This is an action by an Alabama state prisoner, William Ernest Kuenzel, pursuant to 28 U.S.C. § 2254.  He challenges the constitutional validity of the conviction he received in the Talledega County Circuit Court on September 23, 1988, for capital murder, for which he was sentenced to death.  The petitioner, with the assistance of an attorney, filed the instant petition for writ of *habeas corpus* on February 7, 2000.  He is incarcerated on Death Row at Holman Correctional Facility in Atmore, Alabama.

This is the third time this court has found that the instant *habeas* petition is barred by the time limitation mandated in 28 U.S.C. § 2244(d).  The first time, in September 2002, this court dismissed the petition as time-barred by § 2244(d).  That decision was vacated and remanded for further proceedings consistent with the Eleventh Circuit Court of Appeals' opinion in <u>Siebert v.</u>

Campbell, 334 F.3d 1018, 1032 (11ᵗʰ Cir. 2003)("Siebert I").  On remand, this court in February

2006 determined that the intervening authority of Pace v. Diguglielmo, 544 U.S. 408, 125 S. Ct.

1807, 161 L. Ed. 2d 669 (2005), effectively overruled Siebert I and compelled the conclusion that

the petition is barred by the one-year limitation of § 2244(d) because petitioner's untimely filed

Rule 32 petition in state court had no tolling effect.  Petitioner appealed that decision, which the

Eleventh Circuit Court of Appeals vacated and remanded for further proceedings including the

resolution of Kuenzel's assertion that he is actually innocent and thus excepted from the procedural

bar described in Siebert II.  Kuenzel v. Allen, 488  F.3d 1341 (11ᵗʰ Cir. 2007).

## I. PROCEDURAL HISTORY IN STATE COURT

On September 23, 1988, the petitioner was convicted after a jury trial for the capital murder

of Linda Offord, a convenience store clerk who was shot to death in 1987 during a robbery.

Evidence presented at trial can be summarized as follows:

Around 11:00 p.m. on the night of Monday, November 9, 1987, Linda Offord was shot to

death at Joe Bob's convenience store in Sylacauga, Alabama, where she worked as a clerk.  The

petitioner was charged with capital murder.  Petitioner's co-worker and roommate, Harvey Venn,[1]

pleaded guilty to a lesser charge and testified at trial that he and Kuenzel had spent the afternoon and

evening of the murder together, riding around Sylacauga in Venn's car.  Both were drinking heavily,

and Venn was smoking marijuana.  He testified that they stopped more than once at Joe Bob's

convenience store to use the restroom and buy cigarettes, and that Kuenzel suggested that they could

---

[1]        Venn is spelled "Vinn" in the transcript, but "Venn" in the appellate opinion.

get "easy money" by robbing the store.  Venn stated that three guns were in his car that night — a 12-gauge shotgun Venn borrowed from Sam Gibbons, a 16-gauge shotgun Kuenzel had borrowed from his father,[2] and a pistol.  Venn told jurors that after a night of riding around and heavy drinking, he and Kuenzel returned to the convenience store about 10:00 p.m. and waited for customers to clear out.  Several witnesses testified that they saw Venn's car at the convenience store the night of the murder, and some identified Venn at the scene.  They said Venn was with another man, whom they could not identify.  Venn said he and Kuenzel left the store at some time after 10:00, but returned around 11:00.  Venn testified that Kuenzel covered the car's license plate, retrieved a shotgun from the back seat of the car, and went into the store.  Within a few seconds, Venn heard a shot and saw Offord fall off the stool where she was sitting at the cash register.  He testified that Kuenzel got into the car and told him to "haul ass."  They left, and Venn said that Kuenzel told him he didn't mean to do it.  They drove to Kuenzel's house and took the guns inside.  Venn said that Kuenzel took the spent shell out of the shotgun, put in into a paper bag, and threw it into a garbage can in front of the residence where they burned trash.  After listening to some music, Kuenzel told him "it was a shame that she had to get killed over some money that wasn't even hers."

A co-worker testified that Venn and Kuenzel were together early in the evening, and came by the company where they worked to sell him some pills.  A teenage girl who knew Venn and

---

[2]      Glenn Kuenzel is referred to as Kuenzel's father and as Kuenzel's step-father. Kuenzel's mother has disputed that Glenn Kuenzel is Kuenzel's biological father, but the relationship is not critical to any matter considered here.  Glenn Kuenzel lived with Kuenzel's mother for most of his childhood and was the father-figure in that household.  Any reference to Kuenzel's father or stepfather is a reference to Glenn Kuenzel, who testified at trial that Kuenzel was at home asleep on the sofa less than an hour before the shooting.

Kuenzel, April Harris, said she was riding in a car past the convenience store about 9:30 or 10:00 p.m. the night of the murder and could see Venn's car in the parking lot. She testified that she saw Venn and Kuenzel just inside the store.

Testimony indicated that Offord was shot with No. 1 buckshot fired from a 16-gauge shotgun. A shell fired from the Kuenzel gun was found in the rubbish bin outside Kuenzel's home. Also found in the search of Kuenzel's home was a notebook in which Kuenzel had written down what Venn had told police about the night of the murder.

The defense presented testimony from Glenn Kuenzel, who said that he went to petitioner's house around 10:30 the night of the murder, and saw through the window that Kuenzel was asleep on the sofa. The defense also offered testimony from Hope Champion, a visitor to Glenn Kuenzel's home, who said that petitioner and Venn had returned the 16-gauge shotgun the day before the murder. The defense further attacked Venn's credibility, showing that he had given prior inconsistent statements, and was also charged in the crime, but was accepting a plea deal.[3] The defense rested after assurances from the defendant that he had decided not to testify.

There was no physical evidence linking Kuenzel to the crime scene. The only blood found was on Venn's left pants leg, and it was the same type as the victim's. Venn's shoes were also tested, and no blood was found on the shoes. A lot of blood was present at the crime scene, but none

---

[3] Another witness called by the defense claimed that he saw Kuenzel shoot Offord earlier during the day. The same witness had previously stated that he saw Harvey Venn commit the murder. A reading of the transcript makes it clear that the witness, who may have been mentally challenged or unstable, did not appear credible to the jury or, for that matter, to the attorneys who questioned him.

was on the customer side of the counter that Offord was behind.  No. 1 buckshot pellets were removed from the scene, along with a piece of wadding from a 16-gauge shotgun.

The jury returned a verdict of guilty to the capital crime.  After the penalty phase of the trial concluded, the jury recommended that petitioner be sentenced to death, and, on November 7, 1988, following the jury's 12-0 recommendation in favor of imposition of the death penalty, the trial judge sentenced petitioner to death by electrocution.  Petitioner appealed his conviction to the Alabama Court of Criminal Appeals, which affirmed the conviction and sentence on June 29, 1990.  Kuenzel v. State, 577 So. 2d 474 (Ala.Cr.App. 1990).  On January 11, 1991, the Alabama Supreme Court affirmed the decision of the appellate court.  Ex parte Kuenzel, 577 So. 2d 531 (Ala. 1991).  A certificate of judgment was issued by the Alabama Court of Criminal Appeals on March 28, 1991.  On October 7, 1991, the United States Supreme Court denied petitioner's application for writ of certiorari.  Kuenzel v. Alabama, 502 U.S. 886 (1991)(Memo).

On October 4, 1993, petitioner filed a petition for post-conviction relief in the trial court pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.  The petition initially was denied on October 6, 1994, as time-barred under Rule 32.2(c), but on May 6, 1996, the trial court granted petitioner's motion to set aside the October 6, 1994, order.  After an answer was filed and petitioner sought discovery, the State filed a motion to reinstate the October 6, 1994, order dismissing the petition as time-barred.  On February 18, 1999, the trial court granted the State's motion and entered an order dismissing the petition as time-barred.  Petitioner appealed the dismissal, which was affirmed by the Alabama Court of Criminal Appeals on January 28, 2000.  He sought rehearing, but that was denied a month later, on February 25, 2000.  He next sought review in the Alabama

Supreme Court, which denied *certiorari* on July 28, 2000.  The United States Supreme Court denied *certiorari* on January 16, 2001.

## II.  PROCEDURAL HISTORY IN FEDERAL COURT

On February 7, 2000, while still litigating his appeals from the dismissal of a Rule 32 petition in the Alabama state courts, the petitioner, represented by counsel, filed a motion in this court seeking a ruling that his one-year limitation period set forth in 28 U.S.C. § 2254 "is tolled until all state court proceedings and possible appeals therefrom" were exhausted.  With the motion, he filed a *habeas corpus* petition, requesting that it be filed if the motion for tolling were denied.  On February 15, 2000, the court denied the motion on the ground that it was premature, deemed the petition filed, treating it as a "place-holder" petition, and stayed proceedings pending notification that all appeals from the state court proceedings had been concluded.

On January 22, 2001, petitioner notified the court that the United States Supreme Court had denied *certiorari* of the appeal from the state Rule 32 denial.  By order dated February 5, 2001, the court lifted the stay and gave petitioner 30 days in which to amend his petition.  Petitioner filed an amended petition on March 23, 2001.

On June 15, 2001, respondents filed a motion to dismiss the petition, contending that the petition is time-barred by operation of 28 U.S.C. § 2244(d)(1) and, alternatively, that the claims are without merit.  Petitioner filed a memorandum of law and a supplemental memorandum in opposition to the motion to dismiss.  Respondents filed an answer on July 11, 2001, together with a memorandum of law and a copy of the record of the trial, appellate, and post-conviction

proceedings.  On September 18, 2001, petitioner moved the court for leave to file a second amended *habeas* petition, which was granted, and the second amended petition was filed November 20, 2001. Respondents filed an amended answer on January 18, 2002, and a brief in response to the second amended petition.  On July 1, 2002, petitioner filed a supplement to the second amended petition and a supplemental brief.  A corrected version of the brief was filed July 8, 2002.

On September 27, 2002, this court entered a memorandum opinion and order dismissing the petition as time-barred.  Petitioner appealed to the Eleventh Circuit Court of Appeals, which issued a mandate on October 15, 2003, vacating and remanding for further proceedings consistent with Siebert v. Campbell, 334 F.3d 1018 (11th Cir. 2003).  On May 11, 2005, however, the respondents filed a renewed motion to dismiss on time-bar grounds based upon the Supreme Court's opinion in Pace v. DiGuglielmo, 544 U.S.408, 125 S. Ct. 1807, 161 L. Ed. 2d 669 (2005).  Petitioner  sought and received an extension of time in which to respond to the motion, with his response being  filed on August 5, 2005.  Respondents filed a reply on August 11, 2005, and petitioner sought to file a sur-reply, which was granted.  The sur-reply was filed on August 19, 2005.  On September 2, 2005, the court issued an order that the parties may file additional authority or argument related to the application of Pace in light of the Eleventh Circuit Court of Appeals' August 16, 2005, unpublished decision in Colbert v. Head, 146 Fed. Appx. 340 (11th Cir. 2005).  Both parties filed responses on September 12, 2005.  This court entered an order on February 9, 2006, dismissing the claims on the basis that Pace rendered the instant petition untimely.

Petitioner again appealed, and the Eleventh Circuit Court of Appeals entered an order on June 13, 2007, remanding for a determination of Kuenzel's claim that he is actually innocent.

Relying on the panel decision in Siebert v Allen, 480 F.3d 1089 (11th Cir. 2007), the court of appeals again rejected this court's determination that the instant petition is time barred.  The court of appeals found, however, that the petition is procedurally defaulted because the state courts rejected the Rule 32 petition as being untimely filed, subject to petitioner's argument that he can avoid the default because he is actually innocent under the "miscarriage of justice" exception to the procedural-default doctrine.

### III.  TIMELINESS AND EQUITABLE TOLLING

This court recently faced essentially the same question of timeliness under § 2244(d) in Siebert v. Campbell, Case No. 1:01-cv-2323-IPJ-TMP.  The respondents in the instant case, as in Siebert, assert that the decision made by the Supreme Court in Pace constitutes a change in law on a controlling issue.  Further, the court of appeals' reliance on the authority of Siebert v Allen, 480 F.3d 1089 (11th Cir. 2007) ("Siebert III"), is fatally undermined by the fact that the Supreme Court reversed it after the panel decision was announced in the instant case.  The court agrees that a change in law has occurred, and thus examines whether the intervening decision affects the mandate to treat Kuenzel's petition as timely filed.

The issue presented here is discussed fully in the memorandum opinion entered by the court in Siebert, which is attached hereto.  Stated succinctly, the question is whether petitioner's state Rule 32 petition was "properly filed" for purposes of statutory tolling under 28 U.S.C. § 2244(d)(2) of the time period for filing the instant *habeas* petition, notwithstanding the finding by the Alabama state courts that the Rule 32 petition was not timely filed under state rules.  For all the reasons set

forth in this court's <u>Siebert</u> opinion, the Alabama state courts' determination that Kuenzel's Rule 32 petition was untimely filed under Alabama Rule of Criminal Procedure 32.2(c) constitutes the "end of the matter."  The Supreme Court announced in <u>Pace</u> that a post-conviction petition that has been rejected by the state courts as untimely is not considered "properly filed" within the meaning of the AEDPA's statutory tolling provision.  <u>Pace</u>, 125 S. Ct. at 1810 n.1.

In this case, petitioner filed his post-conviction motion in the state trial court on October 4, 1993, less than two years after the Supreme Court denied *certiorari*, but more than two years after the certificate of judgment was issued by the Alabama Court of Criminal Appeals.  Upon motion of the respondents, the trial court dismissed the petition as untimely filed pursuant to Rule 32.2(c), specifically noting that the certificate of judgment following petitioner's direct appeal was issued by the Alabama Court of Criminal Appeals on March 28, 1991, making any Rule 32 petition filed later than March 28, 1993, untimely.[4]  The Alabama Court of Criminal Appeals affirmed, and both

---

[4]      Alabama Rule of Criminal Procedure 32.2(c) in effect at the time governing petitioner's motion prescribed a limitation period requiring any Rule 32 petition to be filed "within two years after the issuance of the certificate of judgment by the Court of Criminal Appeals under Rule 41, A.R.App.P...."  Except for a shortening of the time limit from two years to one, this rule has remained unchanged since at least 1990, before petitioner filed the Rule 32 petition in question here.  The Alabama courts consistently have ruled that the triggering date for the running of the Rule 32.2(c) time limit is the date the Alabama Court of Criminal Appeals issues a certificate of judgment, except that a timely petition for *certiorari* in the Alabama Supreme Court will stay the effect of the certificate of judgment until the *certiorari* is resolved.  <u>See</u> <u>Thomas v. State</u>, 893 So. 2d 563 (Ala. Crim. App. 2002); <u>Wesley v. State</u>, 706 So. 2d 855 (Ala. Crim. App. 1997).  The reference in Rule 41 of the Alabama Rules of Appellate Procedure to *certiorari* in the "Supreme Court" necessarily means the Alabama Supreme Court, not the United States Supreme Court.  Rule 1 of the Alabama Rules of Appellate Procedure defines the scope of the rules as governing appeals to "the Supreme Court, the Court of Civil Appeals, and the Court of Criminal Appeals," all of which are clearly intended to be a reference to the state appellate courts, as Alabama has no authority to promulgate rules governing appeals in the United States Supreme Court.  Thus, under Alabama law, the Rule 32.2(c) time limit began to run on the date the Alabama Court of Criminal Appeals issued

the Alabama Supreme Court and the United States Supreme Court denied *certiorari*. Thus, the state courts determined conclusively, applying the clear language of the applicable rule, that, as a matter of state law, the Rule 32 petition filed in October 1993 was untimely at the time it was filed.

Based on this finding by the Alabama state courts, this court concluded that the instant *habeas* petition filed in February 2000 also was not timely filed under 28 U.S.C. § 2244(d), which mandates a one-year limitation period for the filing of federal *habeas* actions. The one-year limitation period began to run for petitioner on the date § 2244(d) was enacted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") by Congress, April 26, 1996, and would have expired on April 26, 1997. Section 2244(d)(2), however, provides for the tolling of the limitation period during the pendency of a "properly filed" state post-conviction collateral petition. Because petitioner's Rule 32 petition was pending on the date the AEDPA was enacted, it could have tolled the running of the one-year limitation during its pendency, but only if it was a "properly filed" petition. And that is the point of controversy in this case. Respondents contend that it was not "properly filed" because the state courts determined conclusively that it was untimely filed in violation of Rule 32.2(c). Petitioner argues that this question was resolved in his favor by the Eleventh Circuit Court of Appeals' decisions in <u>Siebert v. Campbell</u>, 334 F.3d 1018 (11th Cir. 2003) ("<u>Siebert I</u>"), and in this case, in which that court determined that the time limitation for filing Rule 32 petitions in Alabama state court was not "jurisdictional" in nature until 2000 and, therefore,

---

its certificate of judgment (March 28, 1991), not the later date on which the United States Supreme Court denied *certiorari* (October 7, 1991). The then-existing two-year limitation period under Rule 32.2(c) expired on March 28, 1993, but the Rule 32 petition was not filed until October 4, 1993.

was not a "condition to filing" that would preclude a finding that it was "properly filed" under § 2244(d)(2) and <u>Artuz v. Bennett</u>, 531 U.S. 4, 121 S. Ct. 361, 148 L. Ed. 2d 213 (2000).

Relying on <u>Siebert I</u>, the court of appeals reversed this court's earlier dismissal and remanded for further proceedings on the instant *habeas* petition.  When the United States Supreme Court announced its decision in <u>Pace</u>, however, the respondents renewed their motion to dismiss the petition as untimely filed.  As discussed much more extensively in this court's memorandum opinion in <u>Siebert v. Campbell</u>, Case No. 1:01-cv-2323-IPJ-TMP (attached), this court believed (and still believes) that <u>Pace</u> constituted an intervening controlling authority that excused the court from following the mandate of the court of appeals under the law-of-the-case doctrine.  This court noted in its memorandum opinion dismissing this petition as time barred for a second time (Doc. 93) that the Supreme Court in <u>Pace</u> said:

> "[W]e hold that time limits, *no matter their form*, are 'filing' conditions." <u>Pace</u>, 125 S. Ct. at 1814 [italics added].  The Court then stated unequivocally that, when the state courts hold that a post-conviction petition is untimely under state law, "'that is the end of the matter' for purposes of § 2244(d)(2)." <u>Id</u>. at 1812.

(Doc. 93, p. 7).  Thus, the essential holding and rationale of <u>Pace</u> is that, once state courts apply state law to the question of the timeliness of the filing of a state petition, the federal courts are not free to second-guess whether that determination creates a "condition to filing" or a "condition to obtaining relief."  It is a "condition to filing," which precludes a finding that an untimely petition was, nonetheless, "properly filed" for § 2244(d)(2) purposes.  The court concluded in 2006 (Doc. 93), therefore, that notwithstanding the mandate of the court of appeals, <u>Pace</u>, as intervening and controlling authority, required the court to hold that the petition is time barred.

11

On appeal from that dismissal, the court of appeals stated that the only issue was whether Pace overruled Siebert I. Citing to yet another decision in Siebert v. Allen, 480 F.3d 1089 (11th Cir. 2007) (Siebert III), the court of appeals again reversed this court, holding that Pace had not overruled Siebert I and, thus, was not sufficient intervening authority to warrant the court's departure from the mandate. The appellate court remanded the case to this court with the instruction that it proceed to consider the petitioner's arguments that the procedural default of his claims can be excused because he is actually innocent. Once again, however, this court believes that intervening authority from the Supreme Court fatally undermines the court of appeals' reliance on Siebert I and Siebert III.

In concluding that Siebert I had not been overruled by the Supreme Court in Pace, the court of appeals relied upon its decision in Siebert v. Allen, 480 F.3d 1089 (11th Cir. 2007) ("Siebert III"). The entire foundation for the decision by the court of appeals in this case, that the petition is not time barred, flows from the opinion in Siebert III that Pace did not overrule Siebert I. The court said:

> In April 2006, in accordance with 28 U.S.C. § 2253(c), the district court issued a Certificate of Appealability ("COA") specifying the only issue on appeal as whether Pace overruled Siebert I. After briefing and oral argument in this case were concluded, another panel of this court answered this question in the negative. See Siebert v Allen, 480 F.3d 1089, 1090 (11th Cir. 2007) ("Siebert III"). The district court therefore erred in dismissing Kuenzel's petition as untimely under AEDPA.

Kuenzel v. Allen, 488 F.3d 1341, 1342 (11th Cir. 2007) (Doc. 108 in this case). Thus, whether petitioner's *habeas* petition is timely filed under AEDPA rests on the strength of the authority in Siebert III that Pace did not overrule the holding in Siebert I that only state time deadlines for filing post-conviction petitions that are "jurisdictional" could be "conditions to filing" sufficient to prevent

an untimely filed state petition from being "properly filed" for purposes of tolling the AEPDA limitation period.

Siebert III, however, was itself reversed by the Supreme Court.  In Allen v. Siebert, 552 U.S. 3, 128 S. Ct. 2, 169 L. Ed. 2d 329 (2007), decided five months after the court of appeals' decision in the instant case,[5] the Supreme Court reversed the Eleventh Circuit, saying:

> The District Court dismissed Siebert's habeas petition as untimely, reasoning that an application for state postconviction relief is not "properly filed" if it was rejected by the state court on statute-of-limitations grounds.  The Court of Appeals reversed, however, holding that Siebert's state postconviction petition was "properly filed" within the meaning of § 2244(d)(2), because the state time bar was not jurisdictional and the Alabama courts therefore had discretion in enforcing it.  See Siebert v. Campbell, 334 F.3d 1018, 1030 (C.A.11 2003) (per curiam).  The Court of Appeals accordingly remanded to the District Court to consider the merits of Siebert's petition.

> While Siebert's habeas petition was pending on remand in the District Court, we decided Pace v. DiGuglielmo, 544 U.S. 408, 125 S. Ct. 1807, 161 L. Ed. 2d 669 (2005).  In Pace, we held that a state postconviction petition rejected by the state court as untimely is not "properly filed" within the meaning of § 2244(d)(2).  Id., at 414, 417, 125 S. Ct. 1807.  Relying on Pace, the District Court again found that Siebert's state postconviction petition was not "properly filed," and dismissed his federal habeas petition as untimely.  The Court of Appeals, however, reversed and remanded.  In a one-paragraph opinion, the court distinguished Pace on the ground that Rule 32.2(c), unlike the statute of limitations at issue in Pace, "operate[s] as an affirmative defense." 480 F.3d 1089, 1090 (C.A.11 2007).  Thus, the court found its prior holding — that Siebert's state postconviction petition was "properly filed" because the state court rejected it on a nonjurisdictional ground — stood as the law of the case.  Ibid.

> The Court of Appeals' carve-out of time limits that operate as affirmative defenses is inconsistent with our holding in Pace.  Although the Pennsylvania statute

_____

[5]      Kuenzel v. Allen, 488 F.3d 1341, 1342 (11th Cir.  2007), was decided in June 2007 and Allen v. Siebert, 552 U.S. 3, 128 S. Ct. 2, 169 L. Ed. 2d 329 (2007), was announced by the Supreme Court in November 2007.

of limitations at issue in Pace happens to have been a jurisdictional time bar under
state law, see Commonwealth v. Banks, 556 Pa. 1, 5-6, 726 A.2d 374, 376 (1999),
the jurisdictional nature of the time limit was not the basis for our decision.  Rather,
we built upon a distinction that we had earlier articulated in Artuz v. Bennett, 531
U.S. 4, 121 S. Ct. 361, 148 L. Ed. 2d 213 (2000), between postconviction petitions
rejected on the basis of "'filing' conditions," which are not "properly filed" under
§ 2244(d)(2), and those rejected on the basis of "procedural bars [that] go to the
ability to obtain relief," which are.  Pace, supra, at 417, 125 S. Ct. 1807 (citing Artuz,
supra, at 10-11, 121 S. Ct. 361).  We found that statutes of limitations are "filing"
conditions because they "go to the very initiation of a petition and a court's ability
to consider that petition."  Pace, 544 U.S., at 417, 125 S. Ct. 1807.  Thus, we held
"that time limits, no matter their form, are 'filing' conditions," and that a state
postconviction petition is therefore not "properly filed" if it was rejected by the state
court as untimely.  Ibid. (emphasis added).

* * *

We therefore reiterate now what we held in Pace: "When a postconviction
petition is untimely under state law, 'that [is] the end of the matter' for purposes of
§ 2244(d)(2)."  544 U.S., at 414, 125 S. Ct. 1807 (quoting Carey, 536 U.S., at 226,
122 S. Ct. 2134; alteration in original).  Because Siebert's petition for state
postconviction relief was rejected as untimely by the Alabama courts, it was not
"properly filed" under § 2244(d)(2).  Accordingly, he was not entitled to tolling of
AEDPA's 1-year statute of limitations.

Allen v. Siebert, 552 U.S. 3, 5-7, 128 S. Ct. 2, 169 L. Ed. 2d 329 (2007).  With the reversal of the

court of appeals' decision in Siebert III, the foundation for the holding in this case, that the AEDPA

time bar was tolled by the untimely filed state post-conviction petition, crumbled.  The intervening

authority of Allen v. Siebert, therefore, requires the court to return — for the third time — to its

original conclusion that the habeas petition in this action is time barred under § 2244(d) and that the

state post-conviction petition rejected by the state courts as untimely filed was not "properly filed"

for purposes of tolling the AEDPA one-year limitation.

14

As Supreme Court authority on point, this court is required to follow Pace, even though it apparently undermines the Eleventh Circuit's decision in Siebert v. Campbell, 334 F.3d 1018 (11th Cir. 2003), and the mandate in this case. The mandate in this case was fatally undermined by Allen v. Siebert, which reversed the very case the court of appeals relied on for its decision in this case. Allen v. Siebert leaves no doubt that Pace indeed overruled Siebert I. Applying Pace to this case, therefore, leads the court to the conclusion that, because petitioner's state Rule 32 petition was not timely filed, it was not "properly filed" for purposes of statutory tolling under § 2244(d)(2) and thus, the instant petition is due to be dismissed as untimely filed as well.

Finding that statutory tolling does not apply, the court also rejects the petitioner's *equitable* tolling argument. Petitioner has made the argument that he is entitled to equitable tolling because the state court did not ultimately find that the Rule 32 petition was untimely until long after the one-year AEDPA limitation period had expired. Even though there is no statutory tolling available to petitioner, the limitation period might be equitably tolled by "extraordinary circumstances that are both beyond [petitioner's] control and unavoidable even with diligence." Sandvik v. United States, 177 F.3d 1269 (11th Cir. 1999). This argument was addressed in this court's earlier order dismissing the petition, which is incorporated here. Petitioner was on notice as early as 1993 that his Rule 32 petition might be untimely when the respondents raised that very issue in a motion to dismiss the Rule 32 petition, which the state court initially granted. While it was not a concern at the time for his future *habeas* action, the enactment of the one-year limitation in the AEDPA in 1996 made it a concern, and he clearly could have filed a protective "place-holder" *habeas* petition within the one-year period after April 1996. Recent authority indicates that petitioner could have protected his

rights simply by filing a protective *habeas* petition, which the court could then stay and hold in abeyance while the matter was litigated in the state courts.   See Rhines v. Weber, 544 U.S. 269, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005).   Indeed, this very petition, filed in February 2000, was a "place-holder" petition in the sense that he still was litigating in state court at the time it was filed — albeit too late.   Petitioner is unable to demonstrate the requisite diligence to be entitled to equitable tolling of the limitation period.   He has offered no reason why he could not have filed a protective *habeas* petition in 1996 or 1997, a time during which he was represented by counsel.

## IV.  ACTUAL INNOCENCE

Having concluded that the instant *habeas* petition is time barred, the court nonetheless faces the question remanded by the court of appeals, albeit for a different reason.   In remanding the case to this court, the court of appeals found, not that the petition was time barred under § 2244(d), but that it was procedurally defaulted.   The appellate court then instructed this court to consider whether the procedural default can be excused under the "miscarriage of justice" exception to procedural default. This exception requires the petitioner invoking it to prove his actual, factual innocence of the crime. Preliminary to that issue, however, is whether the petition is even timely filed, which this court has determined that it was not.   Nevertheless, the caselaw appears to suggest that, notwithstanding the time bar, *habeas* relief *may* be available to a petitioner who is "actually innocent."   See, e.g. Helton v. Secretary for the Department Of Corrections, 259 F.3d 1310, 1315 n.2 (11th Cir. 2001), cert. denied, 535 U.S. 1080 (2002); Wyzykowski v. Department of Corrections,

226 F.3d 1213, 1218 (11th Cir. 2000).[6]  Thus, the court's examination of the petitioner's purported

"actual innocence" proceeds in this case in relation to whether he can overcome the § 2244(d) time

bar.

Petitioner argues that "actual innocence" provides an exception to the AEDPA one-year

statute of limitations.  Kuenzel asserts that he is "actually innocent" of the murder for which he was

convicted, and argues that he was at home sleeping when the murder occurred.  He further argues

that he is "actually innocent" of the death penalty in that his attorney failed to present sufficient

evidence of mitigating factors at the penalty phase of his trial.   As discussed *infra*, petitioner has

failed to provide new, reliable evidence as is necessary to demonstrate that he is actually innocent.

Furthermore, he has not proven that he is entitled to further discovery on this issue.[7]  See Melson v.

Allen, 548 F.3d 993, 1003 (11th Cir. 2008); Weeks v. Bowersox, 119 F.3d 1342, 1353 (8th Cir. 1997),

cert. denied, 522 U.S. 1093 (1998)(The actual innocence gateway is not intended to provide

---

[6]      These cases actually point out that the Eleventh Circuit has never decided whether "actual innocence" is an exception to the time bar of § 2244(d), although they discuss the arguments that failing to recognize such an exception might violate the Suspension Clause of the Constitution with respect to *habeas* petitioners who can demonstrate their actual innocence.  To avoid deciding this constitutional question, courts first address whether, in fact, the petitioner has made a sufficient showing of "actual innocence," and most petitions fail on this requirement.

[7]      Petitioner has asserted that discovery is needed as to Chris Morris, David Pope and Pete Limbaugh.  Petitioner argues that one of these men may have been the man with Venn at the convenience store at the time of the murder.  Petitioner has not demonstrated, however, that the identity of these three men was unknown to him at the time of trial; merely that he was not given full information about the police investigation into these alleged suspects. Petitioner further asserts that additional discovery is needed about the investigation into the shotgun and shell that were used at trial to implicate Kuenzel.  Again, he has not argued that, at the time of trial, any information about the firearms expert or the firearms evidence was not available to him.  Finally, he has not shown, or even asserted, that he exercised any form of diligence in seeking to discover the information he now claims would demonstrate his innocence.

17

petitioner with a new trial "with all the attendant development of evidence, in hopes of a different result.").  Finally, he has failed to show that a hearing would be necessary in order for the court to evaluate the reliability of the evidence he has offered.  A *habeas* petitioner is not entitled to an evidentiary hearing "on the threshold issue of cause and prejudice, or fundamental miscarriage of justice, unless he or she proffers 'specific facts which support a finding that one of [the] exceptions to the procedural default rule exists.'"  Baldwin v. Johnson, 152 F.3d 1304, 1319 (11th Cir. 1998), cert. denied, 526 U.S. 104 (1999), quoting Hill v. Jones, 81 F.3d 1015, 1023 (11th Cir. 1996).  The burden is on petitioner to "demonstrate a likelihood that an evidentiary hearing will produce the sort of reliable evidence demanded by Schlup [v. Delo, 513 U.S. 298, 326-27, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995).]"  Jemison v. Nagle, 158 Fed. Appx. 251, 256 (11th Cir. 2005).  For all the reasons explained *infra*, to the extent that petitioner's briefs contain a motion for discovery and/or a motion for evidentiary hearing, both are due to be and hereby are DENIED.  For all the reasons set forth below,  the court also concludes that the instant petition is due to be dismissed as untimely.


### A.  Application of Actual Innocence "Gateway" to Time-Barred Claims

An "actual innocence" exception has been well established in the context of a procedural default since the Supreme Court held that a claim of actual innocence may "avoid a procedural bar" to consideration of the merits of a *habeas* petitioner's claims.  Schlup v. Delo, 513 U.S. 298, 326-27, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995).  In Schlup, a *habeas* petitioner sought review of claims of ineffective assistance of counsel and other constitutional errors at trial in a successive *habeas* petition.  Those claims were procedurally barred, but petitioner sought to escape the bar by

18

demonstrating that he was actually innocent and, being so, the court's refusal to hear his claims would result in a miscarriage of justice. 513 U.S. at 321. Accordingly, the claim of actual innocence provides a "gateway" through which otherwise procedurally barred constitutional claims may be considered. Id. at 315. An "actual innocence" exception to the bar on successive *habeas* petitions was codified through AEDPA at 28 U.S.C. § 2244(b)(2)(B)(ii), but Congress did not include the same or any similar exception in the provisions governing time limitations at § 2244(d).

To date, the Supreme Court never has held that actual innocence may be used to overcome the one-year deadline.[8] That issue has been presented to federal courts of appeals on several occasions, but most never have been required to decide it because the claimant usually is unable to make an adequate showing of actual innocence. In 2001, the Eleventh Circuit Court of Appeals expressly noted that it never has decided whether the "actual innocence" exception applies in the context of the AEDPA's one-year filing deadline. Helton v. Secretary for the Department of

---

[8]     While the question whether actual innocence can be a "free standing" basis for *habeas* relief was broached in Herrera v. Collins, 506 U.S. 390, 400, 113 S. Ct. 853, 860, 122 L. Ed. 2d 203 (1993), it was not answered. The Court noted that innocence, absent some underlying constitutional violation, is no independent ground for *habeas* relief, because *habeas* relief is available to ensure a defendant's constitutional rights, and "not to correct errors of fact." Id. While it is troubling to imagine that a *habeas* court is without power to free a prisoner who makes a clear and convincing showing that he is innocent, it appears to this court that that possibility exists under the law. Of course, petitioners with meritorious claims of actual innocence have open to them relief through the state by way of clemency, which the Fifth Circuit Court of Appeals has noted is available in all of the states that authorize capital punishment. See Lucas v. Johnson, 132 F.3d 1069, 1075 (5th Cir. 1998). In the instant case, however, the petitioner does not assert a free-standing claim of actual innocence – a Herrera innocence claim – based upon the premise that the execution of one who is actually innocent is in itself a violation of the Eighth Amendment. Instead, petitioner asserts a procedural claim of innocence as a method by which he may avoid the bar to adjudication of his other constitutional claims, such as claims of ineffective assistance of counsel. See Schlup, 513 U.S. at 314-15.

Corrections, 259 F.3d 1310, 1315 n.2 (11th Cir. 2001), cert. denied, 535 U.S. 1080 (2002).  The court of appeals observed that other courts "have been able to avoid deciding the difficult constitutional issue of whether the clause requires an exception to § 2244(d) for actual innocence because the petitioners were unable to make a showing of actual innocence."  Wyzykowski v. Department of Corrections, 226 F.3d 1213, 1218 (11th Cir. 2000).   See also Lucidore v. New York State Division of Parole, 209 F.3d 107, 114 (2d Cir. 2000), cert. denied, 531 U.S. 873 (2000), (finding that petitioner failed to demonstrate actual innocence and therefore failing to reach the issue).

The trend toward recognizing that justice demands an exception exist for those who demonstrate actual innocence, however, has begun.  In January of 2005, the Sixth Circuit Court of Appeals held that a credible claim of actual innocence will equitably toll the limitations period, allowing an otherwise time-barred *habeas* claim to be evaluated on the merits.  Souter v. Jones, 395 F.3d 577, 588-590; cf. Escamilla v. Jungwirth, 426 F.3d 868, 871-72 (7th Cir. 2005); but see Workman v. Bell, 227 F.3d 331, 342 (6th Cir. 2000)(*en banc*), cert. denied, 531 U.S. 331 (2000), (noting in *dicta* that a petitioner who lets the time run "either purposefully or by inadvertence" cannot receive relief on an untimely petition even if he claims actual innocence); Barreto-Barreto v. United States, 551 F.3d 95, 102 (1st Cir. 2008)(finding that the actual innocence exception does not apply to the § 2255 one-year limitation period, and noting that defendants who are innocent are "constrained by the same explicit statutory or rule-based deadlines as those against whom the evidence is overwhelming.").

The Eleventh Circuit Court of Appeals similarly noted in February 2005 that innocence may serve "to lift the procedural bar caused by Appellant's failure timely to file his § 2255 motion."

United States v. Montano, 398 F.3d 1276, 1284 (11th Cir. 2005).[9]  In Montano, the court recognized that a procedural default, such as failure to appeal, "is different than the statute of limitations default," yet applied the exception to the time-bar as well.  Id. at 1285 n. 8.  The appellate court did not explain its reasoning in applying, apparently for the first time, the "actual innocence" exception to the time-bar, and the only Supreme Court opinion cited in Montano is a case in which the petitioner had procedurally defaulted his claim by failing to raise the issue on appeal.

While Montano does not enunciate its reasoning for extending the "actual innocence" exception to time-barred claims, the Second Circuit Court of Appeals carefully examined the question in Doe v. Menefee, 391 F.3d 147, 159-161 (2d Cir. 2004), cert. denied, 546 U.S. 961 (2005), but ultimately found, as it did in Lucidore, that the issue need not be decided because the petitioner failed to make a sufficient showing of actual innocence.  In Doe, the appellate court determined that the AEDPA's one-year limitations period "protects the same values of comity and finality as do the procedural limits on successive and defaulted petitions" and should therefore be subject to the same exception for those who show their actual innocence.  Id. at 161.  The court further noted that the standards for assessing innocence set forth in Schlup must be applied, and that if a petitioner shows that it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," he may then access review of his otherwise time-barred claims via the "actual innocence" gateway.  Doe, 391 F.3d at 161-62, citing Schlup, 513 U.S. at 324,

---

[9]      This opinion supercedes U.S. v. Montano, 381 F.3d 1265, 1273 (11th Cir. 2004), which erroneously applied the time-bar set forth at 28 U.S.C. § 2244(d), which is the statute of limitation at issue here.  The superceding opinion instead examines the time-bar that applies to federal prisoners seeking relief through a motion to vacate or set aside filed pursuant to § 2255.

237-38.  It is interesting to note that in <u>Doe</u> the Second Circuit Court of Appeals limited the application of the actual innocence exception to those instances in which the claim of innocence is supported by "new reliable evidence" that "was not presented at trial."  391 F.3d at 161.  Once the new evidence is proffered, the court "must determine whether the new evidence is trustworthy by considering it both on its own merits and, where appropriate, in light of the pre-existing evidence in the record."  391 F.3d at 161, citing <u>Schlup</u>, 513 U.S. at 327-28.

This court finds that <u>Montano</u> provides binding precedent that an "actual innocence" exception applies to time-barred claims as well as to those that have been procedurally defaulted or are successive.[10]  The appellate court, in its order remanding this matter, specifically instructed this court to address the petitioner's actual innocence claim, although it did so in the context of an exception to a procedural default, not a time bar.[11]  Moreover, the reasoning of the Sixth and Second Circuit Courts of Appeals persuades the court that application of such an exception is just, given the serious implications of barring a claim by one who demonstrates his actual innocence.

_____

[10]    Since <u>Montano</u>, however, the Eleventh Circuit Court of Appeals has stated that it has "never held that an 'actual innocence' exception exists to AEDPA's one-year statute of limitations." <u>Justo v. Culliver</u>, 2008 WL 3870698 *2 (Aug. 21, 2008); <u>Rich v. Dep't of Corrections State of Fla</u>. 317 Fed. Appx. 881 (11th Cir. 2008); <u>Milton v. Secretary, Dep't of Corrections</u>, 2009 WL 3150246 (11th Cir., Oct. 1, 2009); <u>Delguidice v. Florida Dept. Of Corrections</u>, 2009 WL 3634092 *1, n.2 (11th Cir., Nov. 4, 2009).  Just a few months earlier, however, the same court considered the appeal of a *habeas* petitioner where the district court had concluded that the petitioner had failed to "make the requisite showing of actual innocence in an attempt to overcome the time-bar." <u>Ray v. Mitchem</u>, 272 Fed. Appx. 807 (11th Cir. 2008), cert. denied, 129 S.Ct. 204 (2008).  The court reiterated its statement that it has never held that "actual innocence" is an exception to the statutory time limitation.

[11]    The Court of Appeals also has stated that the "factual issue of whether the petitioner can make a showing of actual innocence should be first addressed, before addressing the constitutional issue of whether the Suspension Clause requires such an exception for actual innocence." <u>Wyzykowski v. Department of Corrections</u>, 226 F.3d 1213, 1218 (11th Cir. 2000).

**B.  Burden of Showing Actual Innocence**

Entering the gateway provided by a claim of actual innocence was not designed to be an easy task, and the burden placed on the *habeas* petitioner is a heavy one.  It is rooted in the long-held notion that "it is far worse to convict an innocent man than to let a guilty man go free."  Schlup, 513 U.S. at 325, quoting In re Winship, 397 U.S. 358, 372, 90 S. Ct. 1068, 1077, 25 L. Ed. 2d 368 (1970)(Harlan, J., concurring).  Having already been convicted of a capital offense, however, a petitioner like Schlup or Kuenzel no longer has the benefit of any presumption of innocence, and instead "comes before the habeas court with a strong – and in the vast majority of the cases conclusive – presumption of guilt."  Schlup, 513 U.S. at 326 n. 42.  The Supreme Court has noted that "experience has taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare."  513 U.S. at 324.  While the burden is on the petitioner to show his actual innocence, the burden for proving a Herrera innocence claim is higher than that imposed on a petitioner seeking to make merely a procedural or gateway innocence claim.  Schlup, 513 U.S. at 316.  A Herrera innocence claim requires a showing that the execution would be "'constitutionally intolerable' even if his conviction was the product of a fair trial."  513 U.S. at 316.  A gateway claim of innocence carries a slightly lower burden, and requires the petitioner to provide evidence that "must establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was the product of a fair trial."  513 U.S. at 316.[12]

---

[12]     Because a petitioner asserting a free-standing Herrera innocence claim has a more onerous burden than one asserting a gateway claim, the court need not address any free-standing innocence claim unless or until petitioner has met the less demanding Schlup standard.

**C.  Sufficiency of a Showing of Actual Innocence**

As explained in <u>Souter</u> and <u>Doe</u>, the petitioner seeking to enter the "actual innocence gateway" must make a "credible showing" of innocence by providing the court with "new reliable evidence."  See <u>Davis v. Terry</u>, 465 F.3d 1249, 1251 n.2 (11th Cir. 2006)("To pass through the <u>Schlup</u> 'gateway,' a petitioner's new evidence must 'establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was the product of a fair trial.'")(quoting <u>Schlup</u>, 513 U.S. at 316, 115 S.Ct. 851).   A sufficient showing "requires the petitioner to produce '"new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial.'"" <u>Melson v. Allen</u>, 548 F.3d 993, 1002 (11th Cir. 2008), quoting <u>Arthur v. Allen</u>, 452 F.3d 1234, 1245 (11th Cir. 2006), quoting <u>Schlup</u>, 513 U.S. at 324; <u>Milton v. Secretary, Department of Corrections</u>, 2009 WL 3150246 (11th Cir., Oct. 1, 2009).  The Fifth Circuit Court of Appeals has noted that, in addition to exculpatory scientific evidence, trustworthy eyewitness accounts, and certain physical evidence, "credible declarations of guilt by another" are examples of the types of new, reliable evidence that may be used to establish factual innocence.  <u>Fairman v. Anderson</u>, 188 F.3d 635, 644 (5th Cir. 1999), citing <u>Schlup</u>, 513 U.S. at 324; <u>Sawyer v. Whitley</u>, 505 U.S. 333, 340, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (1992).

A threshold question then becomes whether the evidence proffered in support of an innocence claim is new.  "New evidence" has not been defined by the Supreme Court or the Eleventh Circuit Court of Appeals in the context of the actual innocence gateway, but the Fifth Circuit Court of Appeals, evaluating both a free-standing actual innocence claim and a "gateway" claim in <u>Lucas</u>

v. Johnson, 132 F. 3d 1069, 1074 (5th Cir. 1998), set the same evidentiary standard for both. That court noted that "much of the evidence alleged by Lucas to be newly discovered is neither new nor newly discovered, but in its essence and character, was presented, or available to present, to the trial jury." That court went on to require a showing that: "(1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the defendant's failure to detect the evidence was not due to a lack of diligence; (3) the evidence is material, not merely cumulative or impeaching; and (4) the evidence would probably produce acquittal at a new trial." 132 F.3d at 1075 n.3. Similarly, both the Seventh and Eighth Circuit Court of Appeals have required that a claim of actual innocence be brought within a year of the date on which the facts could have been discovered through the exercise of due diligence. Araujo v. Chandler, 435 F.3d 678, 680-81 (7th Cir. 2005), cert. denied, 549 U.S. 820 (2006)(finding that the petitioner failed to exercise the requisite diligence in bringing to federal court the facts he claimed show that he is innocent); Flanders v. Graves, 299 F.3d 974 (8th Cir. 2002), cert. denied, 537 U.S. 1236 (2003). In the Tenth Circuit, the appellate court has required that a petitioner demonstrate due diligence in addition to satisfying the "high actual innocence standard." Fleenor v. Scott, 37 Fed. Appx. 415, 417 (10th Cir. 2002). The Ninth Circuit Court of Appeals, in contrast, has taken a broad view of "new" evidence, allowing a petitioner to proceed on the basis of evidence he possessed at trial, but did not present to the jury. See, *e.g.*, Griffin v. Johnson, 350 F.3d 956, 961-63 (9th Cir. 2003), cert. denied, 541 U.S. 998 (2004).[13]

---

[13]     The Second Circuit Court of Appeals has noted, but not yet decided, that a petitioner may be required to demonstrate due diligence in presenting his "new evidence" in order to make a threshold showing of actual innocence. See, *e.g.*, Doe v. Menefee, 391 F.3d 147 (2d Cir. 2004); Whitley v. Senkowski, 317 F.3d 223 (2d Cir. 2003); Dixon v. Miller, 293 F.3d 74 (2d Cir. 2002), cert. denied, 537 U.S. 955 (2002).

Once the petitioner has come forward with new evidence, a *habeas* court next must evaluate the reliability of that evidence.  The court may consider "the timing of the submission and the likely credibility of the affiants" in judging the reliability of the evidence.  Melson, 548 F.3d at 1002.  The court is "not required to test the new evidence by a standard appropriate for deciding a motion for summary judgment."  Bosley v. Cain, 409 F.3d 657, 664 (5th Cir. 2005), cert. denied, 547 U.S. 1208 (2006).  The court not only reaches its own decisions about credibility and reliability, the court further must assess "the likely impact of this new evidence on reasonable jurors."  548 F.3d at 1002. It has been noted that "[n]ew evidence that merely undermines the state's theory of the case but does not rebut specific jury findings of guilt is insufficient to demonstrate actual innocence."  Buckner v. Polk, 453 F.3d 195, 200 (4th Cir. 2006), cert. denied, 549 U.S. 1284 (2007).  The new evidence "must raise 'sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial.'"  Milton v. Secretary, Department of Corrections, 2009 WL 3150246 *2 (11th Cir., Oct. 1, 2009) (quoting Schlup, at 317, 115 S.Ct. at 862).

The court may grant the petitioner an evidentiary hearing to examine the assertion of actual innocence, but a hearing is not required where additional testimony from the affiants is "unlikely to make their revised account any more credible."  Adams v. Harrison, 266 Fed. Appx. 560, 562 (9th Cir. 2008)(noting that the affidavits in question were submitted more than a decade after trial and were of "questionable credibility").  It has been noted that requiring that the district court hold an evidentiary hearing for every proffer of innocence defeats the goal of finality.  In Amrine v. Bowersox, 128 F.3d 1222, 1230-31 (8th Cir. 1997)(Beam, J., dissenting), cert. denied, 523 U.S. 1123 (1998), it was noted: "In attempting to implement *Schlup*, the court exacerbates the confusion

inherent in death penalty habeas litigation and opens the door to repetitive *Schlup*-type hearings in the federal district courts of this circuit by encouraging death-sentenced petitioners to release new and different bits of evidence, piecemeal, at various stages of the habeas proceeding." Moreover, while a hearing may assist the court in determining reliability, hearings are not appropriate where a petitioner seeks to further "develop sufficient evidence of his actual innocence." Weeks v. Bowersox, 119 F.3d 1342, 1353 (8th Cir. 1997).   In Weeks, the appellate court noted that the gateway is not intended to provide petitioner with a new trial "with all the attendant development of evidence, in hopes of a different result," but instead is an "opportunity for a petitioner, aggrieved by an allegedly defective trial and having inexcusably defaulted the available remedies, to raise such a strong doubt to his guilt that, in hindsight, we cannot have confidence in the trial's outcome." 119 F.3d at 1354.

Because of the importance of the evaluation of actual innocence, a district court "is not bound by the rules of admissibility that would govern at trial" and can consider evidence that is "claimed to have been wrongly excluded" or which "became available only after the trial." Schlup, 513 U.S. at 328.  Although inadmissible evidence may be considered, its reliability still must be evaluated by the court.  Similarly, the district court may evaluate the credibility of witnesses who testified at trial, in light of the newly discovered evidence.  518 U.S. at 330-32.   A petitioner meets the threshold requirement if he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.  513 U.S. at 327.[14]

---

[14]    The Fourth Circuit Court of Appeals in O'Dell v. Netherland, 95 F.3d 1214, 1249-1250 (1996), aff'd, 521 U.S. 151 (1997), examined the difficulty of that task, noting:

Consequently, the burden that Kuenzel must meet in order to prevail is to establish by "new, reliable evidence" that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. He must do more than show that a reasonable doubt exists in light of the new evidence. See, e.g., Bosley v. Cain, 409 F.3d 657, 664 (5th Cir. 2005).

It has been noted that actual innocence "means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998); Milton v. Secretary, Department of Corrections, 2009 WL 3150246 *2 (11th Cir., Oct. 1, 2009). Actual innocence means that the person convicted did not commit the crime. Rodriquez v. Johnson, 104 F.3d 694, 697 (5th Cir. 1997), cert. denied, 520 U.S. 1267 (1997), quoting Johnson v. Hargett, 978 F.3d 855, 859-60 (5th Cir. 1992).[15] "Even if the court, as one reasonable factfinder,

---

The district court, in making this determination, must look at two elements: first, all of the evidence that the jury heard at trial, and second, the newly proffered evidence. See Schlup, 513 U.S. at ___, 115 S. Ct. at 867. If it were to look at only the former, and to ask only whether no reasonable juror could have convicted, then it would be doing nothing more than evaluating the sufficiency of the evidence under Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), a question of law reviewable de novo. But the Carrier inquiry is different from that under Jackson in two respects. First, it is asking not whether no reasonable juror could convict – a question of "power" – but whether no reasonable juror would convict – a question of "likely behavior." Schlup, 513 U.S. at ___, 115 S. Ct. at 868. Thus, the Carrier standard "requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." Id. Second, Carrier adds to the calculus the quantum of new evidence that the petitioner presents, evidence whose credibility must be determined and evidence which may call into question the credibility of prior evidence presented at trial. Id. at ___, 115 S.Ct. at 868-69.

[15]     An interesting example of the difference between factual innocence and legal innocence can be found in Harvey v. Jones, 179 Fed. Appx. 294 (6th Cir. 2006), cert. denied, 549 U.S. 925 (2006) in which the Sixth Circuit Court of Appeals held that evidence a killing was done in self defense, or in a context in which the law recognized the right to use deadly force, does not support a finding of actual innocence.

would vote to acquit, the court must step back and consider whether the petitioner's evidentiary showing most likely places a finding of guilt beyond a reasonable doubt outside of the range of potential conclusions that *any* reasonable juror would reach." Doe v. Menefee, 391 F.3d 147, 173 (2d Cir. 2004). In other words, a court may determine that, as factfinder, it would return a verdict of not guilty, yet still reject a petitioner's argument that he is actually innocent. See, *e.g.*, Lambert v. Blackwell, 134 F.3d 506 (3d Cir. 1997), cert. denied, 532 U.S. 919 (2001). As the Eleventh Circuit Court of Appeals noted in Melson, "[t]he demanding nature of the Schlup standard ensures that only the 'extraordinary' case will merit review of the procedurally barred claims." 548 F.3d at 1002.

### D.  Illustrative Cases

A review of cases in which *habeas* petitioners have attempted to demonstrate their actual innocence compels the conclusion that a mere accumulation of additional evidence that would have bolstered the defense and would have persuaded some jurors to acquit still is insufficient to propel a petitioner through the narrow Schlup gateway. In Schlup, the petitioner was an inmate convicted of murder in a jailhouse stabbing. The new evidence he brought forward was the "sworn statements of several eyewitnesses" who said that Schlup was not involved in the crime. After the Supreme Court set forth the new standard for evaluating such an innocence claim, it remanded to the district court, which held an evidentiary hearing. The court heard testimony from 10 eyewitnesses, each of whom testified that Schlup had not been present at the murder scene, and who further explained that they had been unwilling to testify truthfully at trial because of the prison "code of silence" and out

29

of fear for their own safety.  The testimony of the "new" witnesses was buttressed by two other witnesses who testified that Schlup already had entered the dining room of the prison when the stabbing occurred in a hallway.  The district court found that Schlup's new evidence was both credible and reliable, and that "it is more likely than not that no reasonable juror would have convicted [Petitioner] in light of the new evidence."  Schlup v. Delo, 912 F. Supp. 448, 455 (E.D. Mo. 1995).  It thus appears that credible eyewitness testimony, from multiple witnesses, when accompanied by convincing explanations for the delay in producing such testimony, is sufficient to make a colorable showing of actual innocence for purposes of entering the gateway.

A search for instructive case law further indicates that a successful showing of actual innocence is very rare.  The Supreme Court apparently only once has found that a *habeas* petitioner met the heavy burden.  In House v. Bell, 547 U.S. 518, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006), an inmate sentenced to death for a murder conviction brought forward new evidence that semen evidence entered at the trial belonged to the victim's husband, not to him, in "direct contradiction" of the trial presentation.  547 U.S. at 540.  The jury had been informed that the semen on the victim's clothing could have come from the petitioner, who had a previous conviction for sexual assault.  Discovery that the semen belonged to the victim's husband served to drop from the case the only direct evidence of sexual assault.  547 U.S. at 541.[16]  In addition, petitioner presented new testimony that blood evidence used against him appeared to have been deposited on his clothing after the

---

[16]     While the presence of the husband's semen does not prove that House could not have committed the murder, and does not prove that the husband did commit the murder, the court found that it created grave doubt about the state's unequivocal argument to the jury that House committed the murder in the course of raping and/or kidnaping the victim.

autopsy – not while the victim was alive – raising "substantial questions" about the blood's origin. 547 U.S. at 548.  House also brought forward two witnesses who described a confession by the husband, and a history of spousal abuse, pointing for the first time to a different suspect: the victim's husband.  547 U.S. at 548-49.   Even such a strong showing of new evidence by House was not enough to meet the threshold of a free-standing claim of actual innocence as referenced in Herrera, the court held, but was enough to satisfy the Schlup standard to enter the gateway for federal review of his otherwise barred claims.  547 U.S. at 554-55.

In House, the district court granted petitioner 's request for an evidentiary hearing, a motion apparently unopposed by the state.  After examining petitioner's new evidence, along with the evidence presented at trial, the Court made "a probabilistic determination about what reasonable, properly instructed jurors would do."  547 U.S. at 538, citing Schlup, 513 U.S. at 329.  The court further noted that its function "is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors."   547 U.S. at 538.  Even with House's new scientific evidence, and evidence pointing to a new suspect who allegedly confessed, three justices dissented in House, rejecting the notion that "no reasonable juror would vote to convict" the petitioner, even in light of the new scientific evidence and the new evidence that the husband could have committed the crime.  547 U.S. at 555-56 (Roberts, J., dissenting).

While new scientific evidence, such as DNA results that were unavailable at the time of trial, exemplify the type of "new evidence" envisioned by the Court in opening the innocence gateway, a petitioner's own protestations seem inapposite to any definition of "new evidence."  As the Third

31

Circuit Court of Appeals recognized in Hubbard v. Pinchak, 378 F.3d 333, 340 (3d Cir. 2004), cert. denied, 543 U.S. 1070 (2005), a petitioner's "own sworn testimony" cannot be considered new where the petitioner chose not to testify at trial even though he was available to do so.  Such a "choice does not open the gateway," the court opined.  378 F.3d at 340.  To permit such self-serving testimony to suffice would set the bar "so low that virtually every [actual innocence] claimant would pass through it."  378 F.3d at 340.  In short, a petitioner's own insistence on his innocence should not sway the *habeas* court.  As the Eighth Circuit Court of Appeals has noted: "Were protestation of innocence the only prerequisite to application of this exception, we fear that actual innocence would become a gateway forever open to habeas petitioners' defaulted claims."  Wyldes v. Hundley, 69 F.3d 247, 254 (8th Cir. 1995), cert. denied, 517 U.S. 1172 (1996).

The Eleventh Circuit Court of Appeals has found that recantations of trial testimony, attacks on the credibility of witnesses, or evidence that merely adds support to a defense or alibi presented at trial generally do not meet the high standard required for a showing of actual innocence.   The appellate court recently examined the requirement of "trustworthy, reliable evidence that Schlup envisioned" when evaluating affidavits produced by the petitioner in Melson v. Allen, 548 F.3d 993, 1003 (11th Cir. 2008).  Melson offered the court two statements by a co-defendant who swore that Melson was not his accomplice; a recantation from a witness who had testified at trial that Melson asked her to provide a false alibi, and other affidavits implicating another man as the accomplice. Such were deemed insufficient to satisfy Schlup.  Melson, 548 F.3d at 1003-04.  The court further noted that "because Melson failed to make a threshold showing of actual innocence, the district court properly denied his motions for discovery and an evidentiary hearing."  548 F.3d at 1004.

Similarly, in Ray v. Mitchem, 272 Fed. Appx. 807 (11th Cir. 2008), the court found that "an affidavit from a man claiming responsibility for the [crime], an affidavit from a woman claiming the victim told her that she had 'made up' the fact that Ray had beaten her, and a letter purportedly from the victim" were insufficient to make a threshold showing of actual innocence. 272 Fed. Appx. at 811. Moreover, where a petitioner fails to make his threshold showing of actual innocence, the court need not conduct an evidentiary hearing. 272 Fed. Appx. at 811 n. 3.

Other courts have examined evidence that exonerates the petitioner and points to other suspects and still have found it insufficient to meet the strict Schlup threshold. The Sixth Circuit Court of Appeals reversed a district court's order that granted an untimely *habeas* petition, finding that the applicant had failed to meet the Schlup standard. McCray v. Vasbinder, 499 F.3d 568 (6th Cir. 2007), cert. denied, 128 S. Ct. 1236 (2008). In McCray, the petitioner came forward with five affidavits, including his own, which supported his argument that he was not the shooter. The petitioner's own affidavit alleged that he was not at the crime scene when the shooting occurred, and was not clean-shaven (as witnesses had testified) at that time. Four other affiants offered testimony that indicated that the shooter was another man, Anthony Jones. The court discounted this evidence:

> While McCray presents the testimony of many individuals to support his claim of innocence, he has not presented sufficient evidence to satisfy the *Schlup* standard. The sheer quantity of this evidence, in short, is not matched by its quality.
>
> Oyd McCray's affidavit and testimony that he was not on Bessemore Street at the time of the murder adds little in the way of quality to his actual-innocence claim. A reasonable juror surely could discount his own testimony in support of his own cause. *See Riggins v. Norris*, 238 F.3d 954, 955 (8th Cir. 2001) (noting that court is "certainly entitled to disbelieve [defendant's] self-serving testimony"); *Cuppett v. Duckworth*, 8 F.3d 1132, 1139 (7th Cir. 1993) ("[W]e have repeatedly held that self-serving statements by a defendant that his conviction was constitutionally infirm

33

are insufficient to overcome the presumption of regularity accorded state convictions.").

A reasonable juror also could conclude that the testimony of three of the other witnesses – Stacy (his brother), Bacon (his sister), Rice (his aunt) – would not alter the verdict. Not only did they, as family members, have a personal stake in exonerating McCray, *see Bosley v. Cain*, 409 F.3d 657, 665 (5th Cir. 2005), but they did not see the murder and have not provided a good explanation for why they took so long to come forward with evidence that their relation stands wrongly accused of murder.

499 F.3d at 573.   In McCray, the petitioner provided "no scientific evidence linking anyone else to the crime, no confession by [the alleged shooter], and no evidence casting sufficient doubt on [the eyewitness's] testimony so as to ensure that no reasonable juror would have convicted McCray of the crime.   499 F.3d at 576.   The court in McCray ultimately found that:

All of the new evidence in this case, moreover, does nothing to contradict the testimony of an eyewitness, Perrin, who had no reason for lying about the murder and who had a bird's-eye view of the shooting. While we do not doubt the unfortunate possibility lurking in many criminal cases of mistaken identification, that ever-present risk must be handled by the beyond-a-reasonable-doubt standard and the other procedural protections afforded criminal defendants, not by watering down the stringent *Schlup* standard.

499 F.3d at 575-76.

The "new evidence" standard was met, and the time-bar lifted, by the Sixth Circuit Court of Appeals in Souter v. Jones, 395 F.3d 577, 600 (6th Cir. 2005).   There, a petitioner brought forward new evidence that included the recantation from an expert witness about his testimony that the defendant's whiskey bottle had been the murder weapon and other forensic evidence that the bottle did not contain sharp edges, as the prosecution's witnesses had contended at trial. 395 F.3d at 583-

34

84.[17]  The court in <u>Souter</u> first examined the evidence and found that it met the gateway innocence standard in that it proved that it was "more likely than not that no reasonable juror would have found the defendant guilty."  395 F.3d at 597 n. 11.   That court declined to impose any requirement of "due diligence" in obtaining the new evidence, instead finding that the "inherent injustice" of convicting an innocent person overrides any interests in a time limitation.  395 F.3d at 601.   A year later, however, the same court rejected a claim based on actual innocence, finding that the petitioner had "failed to argue or establish" that the new expert testimony was unavailable to him at the time of trial, which suggests that any evidence that could have been presented at trial cannot be considered "new" for purposes of <u>Schlup</u>.  <u>Howard v. Wolfe</u>, 199 Fed. Appx. 529, 534 (6th Cir. 2006).   In contrast, the Seventh Circuit Court of Appeals has stated that evidence used to establish an actual innocence gateway claim need not be newly-discovered, so long as it was "reliable and ... not presented at trial."  <u>Gomez v. Jaimet</u>, 350 F.3d 673, 679 (7th Cir. 2003).   In <u>Gomez</u>, even the defendant's own testimony was considered "new evidence," at least where the defendant also argued that the reason it was not presented at trial was because of the ineffective assistance of trial counsel. 350 F.3d at 680.

Findings of actual innocence — regardless of how leniently the courts define the requirement that evidence be "new" — remain extremely rare.  The Fifth Circuit Court of Appeals examined the weight to be given "new evidence" that another man had committed the crime in <u>Dowthitt v.</u>

_____

[17]     The Sixth Circuit Court of Appeals has found, however, that "new" evidence in the form of a polygraph test is not considered the type of new, reliable evidence required for a <u>Schlup</u> showing, because such evidence is not admissible in the state trial court and generally not deemed reliable. <u>Bolton v. Berghuis</u>, 164 Fed. Appx. 543, 549-50 (6th Cir. 2006), cert. denied, 549 U.S. 1053 (2006).

Johnson, 230 F.3d 733, 742 (2000), cert. denied, 532 U.S. 915 (2001).  The petitioner came forward with a "signed declaration" from his nephew, who said that another man, Delton, admitted that he killed the victim; an unsigned affidavit from an inmate imprisoned with Delton who said Delton admitted guilt; a signed affidavit from the petitioner's brother who said his son had told him that Delton had admitted guilt; and the petitioner's own affidavit asserting his innocence.  The court held an evidentiary hearing, at which Delton testified that he had not confessed to the crime.  The district court concluded that Dowthitt failed to raise substantial doubt as to his guilt, and noted that his evidence "consists solely of affidavits, and these affidavits are 'particularly suspect ... because they consist of hearsay.'"  230 F.3d at 742, quoting Herrera, 506 U.S. at 417.[18]  The court further discounted Dowthitt's evidence as not "newly discovered" based on a finding that he "presented the substance of the affidavits at his trial."  230 F.3d at 742.

Even a victim's statement that the defendant did not commit the crime will not necessarily constitute "new reliable" evidence sufficient to meet the Schlup standard.  In Doe v. Menefee, 391 F.3d 147 (2d Cir. 2004), the Second Circuit Court of Appeals found that the district court had committed clear error in crediting the testimony of the victim and the defendant, who both came forward in a belated *habeas* petition and stated that the offense had not occurred.  Likewise, new scientific evidence that may raise questions about expert testimony used at trial will not be sufficient where "the substantial remainder of the [state's] case has not been discredited and provides ample evidence of guilt."  Albrect v. Horn, 485 F.3d 103, 125 (3d Cir. 2007), cert. denied, 128 S. Ct. 890

---

[18]     Although the court may consider inadmissible evidence, evidence that cannot be admitted still must be evaluated as to reliability.  Statements that are undated, unsworn, or contain hearsay are particularly unreliable.  See Scott v. Lavan, 190 Fed. Appx. 196, 198 (3d Cir. 2006).

(2008). The Third Circuit Court of Appeals has made it clear that the evidence must be more than simply evidence that may have swayed jurors: "Applying what Chief Justice Roberts said in his dissent in *House*, "[t]he question is not whether [Goldblum] was prejudiced at his trial because the jurors were not aware of the new evidence, but whether all the evidence, considered together, proves that [Goldblum] was actually innocent, so that no reasonable juror would vote to convict him." Goldblum v. Klem, 510 F.3d 204, 231 (3d Cir. 2007), cert. denied, 129 S. Ct. 106 (2008). In Goldblum, the court noted that evidence is not "'new' if it was available at trial, but a petitioner 'merely chose not to present it to the jury.'" 510 F.3d at 226 n. 14, quoting Hubbard v. Pinchak, 378 F.3d at 340.

Affidavits that support a defendant's alibi have been deemed insufficient to raise "sufficient doubt" about guilt to meet the Schlup standard. In Washington v. Delo, 51 F.3d 756 (8th Cir. 1995), cert. denied, 516 U.S. 876 (1995), a defendant brought forth two affidavits of witnesses who established that the defendant was with them, and not at the crime scene, when the murder occurred. Without holding a hearing, the court deemed the affidavits unreliable and stated: "At best, these affidavits serve only to narrow the time frame in which Washington could have committed the crime. At worst, they can be considered potentially biased statements made by a friend and a relative about events that are now over twelve years old." Washington, 51 F.3d at 761.

While the district court may hold an evidentiary hearing to examine the new evidence presented by a *habeas* petitioner asserting an actual innocence claim, such hearings are not necessary where the affidavits come long after the trial and are of "questionable credibility." See, *e.g.*, Adams v. Harrison, 266 Fed. Appx. 560, 562 (9th Cir. 2008); *c.f.* Wilkerson v. Cain, 233 F.3d 886, 893 (5th

Cir. 2000)(Garza, J., concurring)(After assuming that the affidavits made a showing of actual innocence, the court addressed petitioner's constitutional claims; however, a concurring opinion noted that such examination was premature and that the "district court must hold an evidentiary hearing to assess the newly introduced affidavits because there are reasons to doubt their reliability.").   To warrant an evidentiary hearing, the petitioner first must demonstrate that an evidentiary hearing would "produce evidence more reliable or more probative than the [affidavits] that were before the district court."   Adams, 266 Fed. Appx. at 562, quoting Griffin v. Johnson, 350 F.3d 956, 966 (9th Cir. 2003).   Speculation as to what evidence might arise is insufficient to warrant holding a hearing or granting a request for discovery.   O'Boyle v. Ortiz, 242 Fed Appx. 529, 531 (10th Cir. 2007).   In O'Boyle, the appellate court affirmed the district court's determination, reached without a hearing and after denying a motion for discovery, that a death penalty petitioner had failed to present the requisite "new, reliable evidence."   The petitioner had asserted that his fingerprints were not found on the weapon, and that ballistic tests, gunshot residue tests, and trace metal tests were not performed on his hands or the hands of the prosecution's witness.   The court stated:

> O'Boyle confuses theoretical innocence with actual innocence. Most of his "new" evidence is really speculation about what *might* be shown *if* certain tests were performed on physical evidence in the case. Such speculation is insufficient to meet the heavy burden to produce "new evidence" from which we could conclude it is "more likely than not that no reasonable juror would have convicted him...." *See Schlup*, 513 U.S. at 324, 327, 115 S.Ct. 851; *cf. Arthur v. Allen*, 459 F.3d 1310, 1310-11 (11th Cir. 2006) (petitioner's "mere speculation" about what the evidence, if tested, might show was insufficient to support discovery request where petitioner had to demonstrate "'good cause' to believe that the evidence sought would 'raise sufficient doubt about his guilt to undermine confidence in the result of the trial'" (citations and brackets omitted)).   In addition, as the magistrate judge noted, the remaining "new" evidence offered by O'Boyle was known by him at the time he pled guilty, and is therefore not new at all.

242 Fed Appx. at 531.

Most of the cases examining whether a *habeas* petitioner has entered the gateway provided by <u>Schlup</u> involve questions of whether the defendant committed the crime.  In the context of the death penalty, however, a petitioner also may prove actual innocence of the sentence itself.  Such an inquiry focuses on whether the defendant is eligible, under the applicable state or federal law, for the death penalty.  <u>Sawyer v. Whitley</u>, 505 U.S. 333, 345-46, 112 S.Ct. 2514, 2523, 120 L. Ed.2d 269 (1992).   In <u>Sawyer</u>, the Supreme Court adopted the reasoning of the Eleventh Circuit Court of Appeals in holding that the actual-innocence inquiry must "focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error."  505 U.S at 347, citing <u>Johnson v. Singletary</u>, 938 F.2d 1166 (11th Cir. 1991)(*en banc*), cert. denied, 506 U.S. 930 (1992).  A finding that a defendant is actually innocent of the death penalty, then, requires a finding that the defendant was not legally eligible to have the death penalty imposed upon him and not that he has additional mitigating evidence that might have persuaded a jury to reach a different decision.  505 U.S. at 347.   The Eleventh Circuit Court of Appeals has stated:

> ... a petitioner may attempt to demonstrate that, whether or not he is guilty of the capital offense, he is "innocent" of the death penalty because none of the aggravating factors legally necessary for invocation of the death penalty applied.  The Supreme Court has emphasized that, in making this determination, a court may not look to new evidence concerning mitigating factors; once it has satisfied itself that the minimum state law requirements concerning the presence of aggravating factors have been satisfied, its review is complete.  *Sawyer v. Whitley*, 505 U.S. 333, 347, 112 S. Ct. 2514, 2524, 120 L. Ed.2d 269 (1992) ("[T]he 'actual innocence' requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error.").  To make this showing, a petitioner "must

show by clear and convincing evidence that, but for a constitutional error, no
reasonable juror would have found the petitioner eligible for the death penalty." *Id.*,
505 U.S. at 336, 112 S. Ct. at 2517.  Thus, a petitioner challenging his underlying
conviction faces a lower burden of proof than a petitioner challenging the existence
of aggravating circumstances rendering him death-eligible.

Sibley v. Culliver, 377 F.3d 1196, 1205-06 (11th Cir. 2004).  See also Downs v. McNeil, 520 F.3d

1311, 1325-26 (11th Cir. 2008).

The cases illustrative of the strict Schlup standard compel the conclusion in this case that

Kuenzel is entitled to have his time-barred claims considered only if he has come forward with new,

reliable evidence that would persuade a reasonable juror that he was not guilty of the crime beyond

a reasonable doubt, or if he has shown by clear and convincing evidence that no reasonable juror

would have found him eligible for the death penalty.   The evidence Kuenzel presents must be

evaluated as to its reliability, taking into account such matters as when it was uncovered, any motive

or bias on the part of any affiant, whether the evidence contains hearsay or other indicia of

unreliability, and whether the evidence supports a finding of factual innocence, as opposed to a mere

attack on the sufficiency of the evidence offered against him at trial.   Discovery relating to new

evidence is appropriate only if the petitioner has met his threshold burden, and not merely because

he speculates that discovery might uncover additional evidence in his favor.[19]  In light of the difficult

---

[19]     The Supreme Court has determined that discovery in a *habeas* action is not granted
"as a matter of ordinary course," but only upon leave of court after a showing of "good cause" and
where diligence has been shown in pursuing the claim about which discovery is sought.   Bracy v.
Gramley, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997); 28 U.S.C. § 2254(e)(2).
Such "good cause" required the petitioner to provide the court with "reason to believe that the
petitioner may, if the facts are fully developed, be able to demonstrate" an entitlement to relief.  520
U.S. at 908-09.

burden, and mindful of the exceptional nature of relief provided through the narrow actual innocence gateway, the court turns to Kuenzel's showing of actual innocence.

### E.  Evidence Offered by Petitioner to Prove Actual Innocence of the Crime

The evidence offered by petitioner in support of his claim of actual innocence of the crime consists of the following:

1.  A memorandum apparently prepared by the forensic firearms expert who testified at trial, relating that evidence from the crime scene was consistent with a finding that the murder was committed with use of a 16-gauge shotgun which fired No. 1 buckshot.

2.  The 1999 affidavit of Carolyn Lewis-Gibbons.  (Ex. 2, Doc. #45).  Gibbons states that her husband told her that Harvey Venn borrowed her husband's shotgun about two weeks before the murder.  She did not see Venn borrow the gun, and does not know when the gun was returned to her husband.  She "believes" that the police interviewed her husband, and that he showed them the shotgun borrowed by Venn.  Her husband died in 1991.  In 1998, she provided the gun that she claims was her husband's to investigators hired by the petitioner's attorney.

3.  The 2002 affidavit of Carl Majesky, a self-described firearms expert.[20]  (Ex. 3, Doc. #45).  He states that he examined a shotgun provided to him by one of Kuenzel's lawyers — purportedly the gun borrowed by Venn — and found that it was a 16-gauge shotgun, not a 12-gauge as Venn testified at trial.  He further states that it is "quite possible" that the Venn gun was the murder

---

[20]     No documentation supporting Majesky's credentials has been supplied to the court.

weapon, instead of the gun that Kuenzel had borrowed from his father.[21]  He further states that it is

"quite possible" that the Venn gun could be fired unintentionally, rather than deliberately, because

the amount of pressure required to pull the trigger was three to five pounds.

      4.   The 2002 declaration of Luther Brannon, a private investigator.  (Ex. 4 to Doc. #45).

Brannon states that he visited the crime scene more than 13 years after the crime was committed for

the purpose of evaluating the credibility of witness April Harris, who testified at trial that she saw

Kuenzel inside the convenience store the night of the murder.  He says that the store is twice as far

from the street as the witness had said it was, and that it was "physically impossible" for the witness

to have identified Kuenzel.

      5.   The 2002 declaration of Everson Thompson, a private investigator.  (Ex. 5 to Doc. #45).

He states that he interviewed Crystal Epperson Ward in 1999, the driver of the vehicle in which

Harris was riding when she saw Kuenzel inside the store.  He states that he contacted Ward 12 years

after the murder and asked her to drive by the crime scene in a manner similar to the way she had

driven past on the night of the crime.  He states that she told him that "there is no way in hell that

April could have seen Harvey and Billy inside the store that night," and that she believes Harris was

lying.  Attached to his declaration is a document he identifies as a transcript of the taped interview

he conducted with Ward in 1999, although the tape has been lost and investigators have been unable

to locate Ward since 1999.

---

[21]     Majesky further states that it is "impossible to determine with any certainty" whether the Venn gun or the Kuenzel gun was the murder weapon without testing the Kuenzel gun and reviewing the notes of the firearms expert who testified at trial.  Kuenzel's attorney has stated that the Kuenzel gun, which was an exhibit at trial, is no longer in the possession of the trial court. Counsel does not allege that any bad faith or ill motive was involved in the gun's disappearance.

6.   The 1997 declaration of Crystal Anne Floyd, the then-13-year-old girlfriend of Venn at the time of the murders.  (Ex. 6 to Doc. #45).  She states that she told police shortly after the murder that Venn visited her at her parents' home for about 10 minutes at about 10:00 p.m. on the night of the murder, that he was alone, was "high on drugs and/or alcohol," and was "acting nervous and paranoid." She further confirms that Venn had visited her earlier in the day, and that Kuenzel had been with Venn on that occasion, when both had been high on drugs or alcohol.

7.   The unsigned declaration of petitioner, who did not testify at the guilt phase of his trial on "advice" of counsel.  (Ex. 8 to Doc. #45).  He further asserts that he had returned the shotgun identified as the murder weapon to his stepfather[22] before the murder occurred.  He states that Venn drove him home before 8:00 p.m. on the night of the murder, and that he watched football on TV, and had a visitor around 9:00 p.m.,[23] then fell asleep on the sofa.  He further states that Venn came to his house around midnight the night of the murder and told him to tell anyone who asked that Venn had arrived there at 10:00 or 10:30.  He also states that he would have disputed some of Venn's testimony.   Finally, he asserts that he was manacled at the ankles during trial, and the jurors "must have seen and heard the manacles."

8.   The declaration of Glenda Kuenzel, petitioner's half-sister.  (Ex. 11 to Doc. #45).  She states that Kuenzel borrowed her father's shotgun, but that he returned it the day before the murder.

---

[22]    Glenn Kuenzel is identified by petitioner as his "dad" and as his "stepfather," although petitioner clearly indicates that Glenn Kuenzel was not his biological father.

[23]    Kuenzel would testify that he had met an attractive woman at a bar a couple of nights before the murder, and that she came to his house that night at 9:00 p.m. to have sex with him, then left about 10:00 p.m.  He identifies her simply as "Lisa."

9.   The declaration of Kenneth Kuenzel, petitioner's half-brother.  (Ex. 12 to Doc. #45).  He states that, sometime over the weekend before the murder, he saw his father's shotgun in the kitchen of the father's home.  He further disputes trial evidence that demonstrated that he and his father left the hospital around 1 p.m. on the afternoon of the murder, asserting that it was later in the day, and that he heard his father's truck start around 10:00 p.m. the night of the murder.

10.   The declaration of William Willingham, Kuenzel's trial counsel.  (Ex. 14 to Doc. #45). He states that he was not experienced in capital cases, did not "adequately" prepare for the guilt phase of trial, and prepared "hardly at all" for the sentencing phase. He further states that he did not believe the evidence against his client was strong and was "lulled into complacency."

Before addressing whether the evidence presented is new and reliable, the court makes a preliminary assessment that some of the evidence must simply be disregarded as irrelevant because, even if new and reliable, it does not address the core issue of actual innocence.   Certainly, the affidavit of trial counsel that he did not prepare adequately and did not believe the evidence against his client was strong has no bearing on whether the petitioner committed the crime.  Accordingly, the Willingham declaration merits no consideration in determining the petitioner's showing of factual innocence of the murder of Linda Offord.

Considering in turn the other evidence presented in relation to guilt, the court finds that the Gibbons declaration is little more than a hearsay account of what Gibbons was told by her husband. Mindful, however, that inadmissible evidence may be considered, the court looks to the substance of her testimony.   Assuming, without deciding, that the substance of what Gibbons testified her husband told her more than 20 years ago is true, it provides nothing more than that Venn had a

shotgun in his possession around the time of the murder.  Venn admitted at trial that the night of the murder, he had a shotgun with him in the car when he and Kuenzel were riding.  Assuming, again without deciding, that the gun Gibbons showed petitioner's counsel some 12 years after the murder was the same gun lent to Venn in 1987, petitioner has shown only that Venn lied or was mistaken about the gauge of the shotgun he testified about at trial.  While this might impeach some of Venn's credibility, it does not refute his basic story.  The new evidence does not refute Venn's testimony, which the jury clearly believed, that Kuenzel took one of the two shotguns out of the car, went into the convenience store to rob it, then shot and killed Linda Offord.

Petitioner argues that this evidence, when combined with the declaration of Majesky, demonstrates that the Venn gun was probably the murder weapon.  Assuming without deciding that the firearms "expert" proffered by the petitioner is qualified to testify as an expert, the new evidence by Majesky does no more than make it possible that the Venn shotgun was the murder weapon, and that the trajectory of the pellets and the amount of pressure required to pull the trigger of the Venn gun make it possible that the shooting was unintentional.  Even if this court were to find that such evidence is both new and reliable, it cannot find that it is of sufficient weight to meet the Schlup standard.  Venn testified that there were three weapons in the car the night of the murder: two shotguns and a pistol.  He testified that one shotgun was a 12-gauge he had borrowed from Gibbons, one shotgun was a 16-gauge that Kuenzel had borrowed from his stepfather, and the other gun was a pistol.  Whether one or both of the shotguns were 16-gauge, and whether the victim was shot with pellets from the shotgun Venn borrowed or the shotgun Kuenzel borrowed does not exonerate Kuenzel and does not show that he is factually innocent of the crime.  At most, this evidence calls

into question Venn's veracity and/or memory.  Even if both shotguns were 16-gauge, that fact does not make it more likely than not that no juror could have found that Kuenzel picked up the Venn shotgun and used it to shoot the victim. It is clear from a reading of the transcript that the jury believed Venn's testimony, even though parts were disjointed and muddled.  Venn testified that he had been drinking heavily.  The jury apparently found his testimony credible in spite of inconsistencies with previous statements and his vague memory of several details. While the prosecutor clearly argued that the Kuenzel shotgun was the murder weapon, this was not a case that hinged on ballistic evidence linking a single bullet to a single gun.  Rather, the evidence proved only that the victim was killed by No. 1 buckshot, most likely fired from a 16-gauge shotgun.

The subtle implication in much of this evidence is that Venn was the shooter, not Kuenzel.  The possibility that Venn also borrowed a 16-gauge shotgun falls far short of proving that he and not Kuenzel was the shooter.  The forensic evidence at the crime scene pointed to the use of a 16-gauge shotgun, not any *particular* 16-gauge shotgun.[24]  Thus, even assuming that Venn's gun also was a 16-gauge, this does not prove that he was the shooter or that Kuenzel was not, nor does it prove that Kuenzel was not involved in the robbery-murder of Linda Offord.

There is no reason to believe that, if faced with testimony that the shotgun Venn borrowed had been a 16-gauge instead of a 12-gauge, the jury would have found the substance of his testimony to be incredible.  Finally, any expert testimony as to whether the gun could have been fired

_____

[24]     Lawdon Yates, a firearms expert offered by the prosecution at trial, testified that the spent shell found in the rubbish can at Kuenzel's house was fired from the gun identified as that borrowed from Glenn Kuenzel.

unintentionally would not likely have changed the outcome of the trial.[25]  Venn himself testified that Kuenzel told him at the time that the shooting was an accident.  The jury did not believe that, given all of the circumstances, the shooting was unintentional.  Evidence that the trigger was more easily pulled would not likely have changed a reasonable juror's determination of intent.[26]

The testimony of Luther Brannon and Crystal Ward, who testified about the visibility of the inside of the convenience store, even if admissible, does nothing more than impeach the credibility of April Harris.  Brannon testifies about the conditions of visibility on a night 14 years after the murder, with no predicate as to whether the location of the lanes of traffic, the lighting, the windows, or the store itself (which is no longer the same business) have remained the same for 14 years.  Ward's testimony[27] is simply that she now thinks Harris was lying, and that she drove by the store 14 years after the event and was unable to identify people inside the store.  Similarly, Brannon's testimony is nothing more than a statement that he is unable to identify people at that distance.  None of the facts relating to the visibility of the store was unavailable to the defendant at trial.  There is

---

[25]     Majesky's testimony also does not show that, even if the trigger pull was "easy" at the time he tested the gun a decade after the shooting, that he could testify that the trigger pull was the same at the time of the murder.

[26]     Respondents further argue that lack of intent, while relevant to legal innocence, is not relevant to factual innocence since it fails to demonstrate that someone else, not petitioner, committed the crime.

[27]     Even crediting Ward with "testimony" is generous.  What the court has been provided is simply Brannon's hearsay account of what Ward told him during an interview.  This is only one example of why no evidentiary hearing would be helpful in this case.  There is no indication that, were a hearing held, Ward could be located to testify.  Even if the court assumed that Ward could be located, that she would testify in the way petitioner claims she would, and that she would be credible, her testimony would not prove that Kuenzel is actually innocent of the crime.  Her testimony could do nothing more than erode the credibility of April Harris, and such attacks on credibility are not sufficient to meet the Schlup standard.

47

no showing that Crystal Ward could not have been called to testify at trial. Certainly, the distance between the street and the store entrance could have been determined at the time of trial. None of the evidence offered by Kunezel in relation to Harris's testimony is "new" evidence. Indeed, this was one of the issues argued at the hearing on petitioner's motion for new trial. See Tab 29, p. 8.

There is at least some question as to how reliable Ward's testimony could be, coming about 14 years after the fact. The jury had Venn's unequivocal testimony that it was Kuenzel who went into the store shortly after 11:00 p.m. with a shotgun and murdered the victim. Even though petitioner argues that Ward's testimony would have made Harris's testimony impossible to believe, and would have left Venn's testimony uncorroborated, this argument ignores the other evidence of Kuenzel's involvement: the shotgun shell found in his rubbish, undisputed testimony that he and Venn were together that afternoon and earlier in the evening, and evidence that Venn was with another man at the convenience store shortly before the murder.[28]

The petitioner next offers the testimony of Crystal Floyd. Her sworn affidavit purports to demonstrate that Kuenzel was not with Venn at 10:00 p.m. on the night of the murder. While this testimony could support petitioner's alibi that he was at home after 8:00 p.m. that night, and that the police knew of Floyd's testimony and did not disclose it to petitioner in violation of Brady, it falls far short of demonstrating factual innocence. Floyd's testimony is contradicted by Venn, who

---

[28] Petitioner's argument that he is "actually innocent" of the murder if his conviction was based upon the uncorroborated testimony of an accomplice, in violation of Alabama Code § 12-21-222, is untenable. While such a conviction might contravene state law, it is not evidence of *factual* innocence, and has no bearing on the question of whether the defendant committed the crime. The mere legal insufficiency of the evidence against him does not prove actual innocence sufficient to overcome the § 2244(d) time bar. Bousley v. United States, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998).

testified that he visited Floyd early in the evening, but was riding around in the car with Kuenzel at about 10:00 p.m., and was at the convenience store near that time.  Floyd's affidavit also is directly contradicted by the testimony of James Clement, who testified that he saw Venn at the convenience store in Venn's car with another man he could not identify at about 10:00.  Clement had no connection to Venn or Kuenzel, and the time at which he saw them is corroborated by the fact that he was officiating at a basketball game that did not end until 9:45 or 9:50 p.m. and he went to the convenience store after the game.  Furthermore, Clement testified that Venn remained at the store until after 10:00, and that fact is corroborated by the testimony of Dale Templin, who arrived at the store around 10:00 or a few minutes thereafter, and stayed for five to ten minutes.  Templin's testimony is corroborated by Wayne Culligan.  Furthermore, witness Keith Phillips testified that he talked to Venn at the convenience store after 10:30 p.m. that night.  All of these witnesses testified that Venn was with another man, whom they could not identify.

Given all of the evidence that Venn was at the convenience store from around 10:00 p.m. until after 10:30 p.m., with another male, the court cannot find that Crystal Floyd's testimony that Venn was alone at her house for about 10 minutes at around 10:00 p.m. would have been credible to a reasonable juror.  Assuming, without deciding, that Floyd's testimony could be deemed "new" evidence, it cannot be considered reliable for purposes of an actual innocence claim.[29]  Floyd, because she was Venn's girlfriend, also had a reason to lie when she talked to police shortly after

---

[29]      It is not likely that the testimony is even "new."  Petitioner knew at the time of the crime that Floyd was Venn's girlfriend.  Petitioner was with Venn at Floyd's house earlier on the day of the murder.  Floyd signed her declaration on November 26, 1997.  Accordingly, this court would not find the evidence to be "new" under the standard of diligence required by Lucas v. Johnson, 132 F. 3d 1069, 1074 (5th Cir. 1998).

the crime: to provide an alibi for her boyfriend.  Floyd's statement does nothing more than call into

question Venn's credibility, and possibly provide support for a <u>Brady</u> claim.[30]  It does not provide

evidence that Kuenzel is factually innocent.

Petitioner next submits, as evidence that he is actually innocent of the crime, his own

declaration.  This testimony simply provides his account of his whereabouts on the night of the

murder.  Petitioner concedes that he could have testified at the guilt phase of his trial, but took the

advice of counsel and declined to do so.  Clearly, petitioner's own account of what happened the

night of the crime, or during the trial, cannot be deemed "new evidence" because petitioner knew

at trial where he was the night of the crime and chose not to take the stand and offer that evidence.

Any evidence that he was manacled during the trial has no bearing whatsoever on the fact of his guilt

or innocence.  More importantly, the evidence of petitioner's alibi — that he was alone at home

asleep on the sofa — was put before the jury through the testimony of Glenn Kuenzel,[31] which was

not believed by them.

Glenn Kuenzel testified that he went to his son's house about 10:00 p.m. on the night of the

murder for the purpose of repairing a broken toilet.  He testified that he looked through a window

---

[30]    Not all evidence that may be deemed exculpatory for purposes of a <u>Brady</u> claim is
sufficient to support a claim of factual innocence.  Proof of factual innocence is a necessary
precondition to examination of the constitutional claim. To pass through the <u>Schlup</u> gateway to gain
consideration of the <u>Brady</u> claim, petitioner must first prove his actual innocence.

[31]    As additional support for his alibi, Kuenzel states that a married woman named Lisa
that he had met in a bar a few nights before came to his house about 9:00 p.m. to have sex with him,
and left before 10:00.  He claims not to know her last name, and apparently never located this
woman again.  Interestingly, in his motion for new trial, Kuenzel claimed the woman was Lisa Sims;
however, she testified at the new trial hearing and denied knowing him.  <u>See</u> Tab 28, pp. 29-32.  It
is simply not credible that Kuenzel  had sex with a mystery woman who has never again been seen.

and saw petitioner asleep on the sofa, and that he then left. Apparently, the jury found this testimony unreliable. Glenn Kuenzel had testified that he took his other son, Kenneth, to the emergency room earlier in the evening, and that the emergency was the reason that he made such a late visit to the defendant's house. That testimony was impeached by hospital records which showed that the emergency room visit occurred about 1:00 p.m., and that the son was discharged before 2:00 p.m., not late in the evening as Glenn Kuenzel testified. Furthermore, Glenn Kuenzel testified that he had worked an early shift that began at 6:00 a.m. both the day of the murder and the day following the murder. In spite of the fact that he had to leave for work about 5:20 a.m., and in spite of the fact that he had been home from the emergency room for hours, Glenn Kuenzel testified that he waited until 10:15 p.m. to set out to fix a toilet that had been broken for at least a couple of days. In addition, he apparently abandoned the plan to fix the toilet simply because he didn't want to wake Kuenzel. The jury found Glenn Kuenzel's testimony incredible. There certainly is no reason to think the jury would find the testimony of the defendant on this point more credible.

Kuenzel also relies upon the declarations of his half-sister and half-brother to support his claim that, before the crime, he returned the 16-gauge shotgun that was entered into evidence at trial as the murder weapon. They also state that they could have testified that Glenn Kuenzel left the house sometime on the evening of the crime, bolstering his claim that he went to Kuenzel's house at 10:15.[32]  Certainly Kuenzel should have known before trial that his half-sister was at the house when he returned the gun. He also knew before trial that his half-brother was living there and could

---

[32]     Certainly, if evidence that attacks the credibility of a witness cannot be deemed evidence that establishes innocence, evidence that bolsters testimony cannot serve that purpose.

have seen the shotgun in the house.  These witnesses are not offering "new evidence;" they simply were never called to the stand.  Their absence at trial was not damaging to the petitioner, however, because another witness, Hope Chamberlain, testified that she was at the house the weekend before the murder when Kuenzel and Venn returned the shotgun.  Unlike the siblings, Chamberlain was not related to Kuenzel, and had no motive to lie.  Glenn Kuenzel also testified that the shotgun was in his kitchen the day before the murder.  The testimony of the half-siblings relating to the return of the shotgun was merely cumulative of the testimony of Glenn Kuenzel and Hope Chamberlain, and less persuasive, given their relation to Kuenzel.  The testimony of the half-sister is even less reliable, given that Kuenzel's declaration names the people at the house when he returned the gun, and fails to include Glenda Kuenzel.  Furthermore, even if the jury had more evidence that Kuenzel had returned the gun before the murder, the jury still could have concluded that Kuenzel committed the murder by using the shotgun Venn had borrowed.  The fact that two additional witnesses could have testified that the gun was returned before the murder — a circumstance that was placed before the jury, and rejected by them — does not prove that Kuenzel is actually innocent of the crime.[33]

In sum, all of the evidence Kuenzel offers now to support his allegation of actual innocence of the shooting is nothing more than an attack on the credibility of Venn, who testified that Kuenzel

---

[33]     At the most, the declarations of Kuenzel's half-siblings support a finding that petitioner received ineffective assistance of trial counsel, a claim not wholly disputed by Willingham. Even so, the attorney's declaration indicates that he did interview several family members about Kuenzel's alibi.  It appears, therefore, that Glenda Kuenzel and Kenneth Kuenzel did not share with counsel then that Kuenzel had returned the gun before the murder, or, if they did, that counsel made some tactical decision not to call them to the stand.  Similarly, Willingham clearly knew at the time of trial who was driving the car in which April Harris was riding.  He failed to pursue her testimony at that time.  Evidence of ineffective assistance, however, is not evidence of actual innocence.

was with him and pulled the trigger; an attack on the credibility of Harris, who testified that Kuenzel was inside the convenience store about the time of the shooting; and evidence that Venn also had access to a 16-gauge shotgun that could have been the murder weapon.[34]  While such evidence, if presented at trial, might have strengthened Kuenzel's defense, none of the evidence is "new" evidence, and it does not constitute "credible" or "reliable" evidence that would result in no reasonable juror finding that Kuenzel was guilty of the capital crime for which he was convicted.

Petitioner has failed to demonstrate diligence in bringing forward his evidence, as required by Lucas, 132 F.3d at 1075 n.3.  He has failed to show that most of the evidence is anything more than hearsay or attacks on credibility of witnesses, which is insufficient to support a showing of actual innocence.  See Dowthitt, 230 F.3d at 742.  Finally, petitioner's evidence, even assuming that it can been considered both new and reliable, is nothing more than testimony that may have swayed jurors in his favor or may have provided some doubt.  The question is not whether petitioner was prejudiced at his trial because the jurors were unaware of the new evidence, but whether all the evidence, considered together, proves that Kuenzel is actually innocent of the murder of Linda Offord, so that no reasonable juror would vote to convict him.  See  Goldblum v. Klem, 510 F.3d 204, 231 (3d Cir. 2007).  This court's own trepidation regarding a jury's finding does not mean the petitioner has made a showing of actual innocence.  In this case, Kuenzel's evidence does not

---

[34]      Again, it must be noted that proof of which gun was fired in connection with the murder does not prove whether it was Kuenzel who pulled the trigger.  Even assuming the gun that Venn had borrowed was the murder weapon, Kuenzel does not dispute that he was in the car with Venn and the gun on the night of the murder.  Accordingly, evidence as to which gun was the murder weapon does not support a claim of actual innocence.

persuade the court that no reasonable juror could have found the petitioner guilty beyond a reasonable doubt.

### F.  Evidence of Actual Innocence of the Death Penalty

As to actual innocence of the death penalty, Kuenzel offers mitigation evidence that was not presented at his trial.   Evidence offered in the instant *habeas* proceeding includes:

1.  The affidavit of Barbara Kuenzel, petitioner's mother  (Ex. 10 to Doc. #45), who testified about her own upbringing in a poor family, and her difficulty in relationships that include violence. She states that she does not know which of many men she was with was Kuenzel's biological father. She also states that Kuenzel witnessed domestic abuse she suffered at the hands of Glenn Kuenzel, and episodes when she and Glenn drank heavily.  She further states that her son moved around a lot as a child, was beaten regularly by a school teacher at one of the many schools he attended, and witnessed Glenn bringing home a succession of women as sex partners. She further described Kuenzel as a good brother to his half-siblings, and a young man who developed a problem with drugs and alcohol.

2.  The sworn affidavit of Glenda Kuenzel Bean, Kuenzel's half-sister.  (Ex. 11 to Doc. #45). She states that  Kuenzel was a caring and attentive brother and son, and that he was beaten by his stepfather, Glenn Kuenzel.

3.  The declaration of Kenneth Kuenzel, petitioner's step-brother (Ex. 12 to Doc. #45), who states that Kuenzel "really raised" him and his sister, Glenda, and that he was protective of his mother and siblings.

4.  The declaration of Mary C. Goody, a self-declared "mitigation specialist"[35]  (Ex. 13 to Doc. #45), who states that trial counsel failed to present all the available evidence that would have supported a finding of mitigating factors.

5.  Petitioner's own testimony (Ex. 8 to Doc. #45).

Petitioner first offers the affidavit of his mother, Barbara Kuenzel.  While the affidavit of Barbara Kuenzel, on its face, looks as if it may have been useful as mitigation testimony in the penalty phase of the trial, a review of the transcript indicates that she testified at the penalty phase of the trial.  She testified at trial that her son was moved around a lot as a child, that he did not have a father around for much of his youth, and that he was a nonviolent person.  She did not testify that they had lived in poverty; rather she testified that her son "pretty much" had everything he could want.  She also did not testify about any abuse.  Her credibility and veracity were severely impaired on cross-examination, however, when the prosecutor brought out evidence that she had "guaranteed" payment to a man if he would testify that he was the one with Venn at the convenience store on the night of the murder.  During this cross-examination, she became belligerent and defiant when faced with the prosecutor's tape recording of a phone call in which she offered payment to the potential witness, even though she never denied making the offer.   A review of the transcript convinces the court that Barbara Kuenzel's additional testimony could have done little if anything to provide mitigating evidence for her son because she was wholly incredible and had, in fact, demonstrated a willingness to encourage a witness to commit perjury in order to help her son.

---

[35]        No documentation supporting her credentials has been supplied to the court.

The other mitigating evidence submitted by petitioner is testimony from petitioner's two half-siblings, who say that he was a loving and caring brother, who practically raised them. They did not testify at the penalty phase, but the evidence they offer cannot be deemed "new." There is no assertion that they could not or would not have provided that testimony if called during the mitigation presentation. Moreover, even if such evidence had been before the jury, it is not worthy of such weight that it convinces this court that the outcome of the trial would have been different.

The only other evidence offered by petitioner as new, reliable evidence that he is not guilty of the death penalty is the testimony of a "mitigation expert" who states that trial counsel failed to fully investigate all of the "relatives, friends, fellow workers and supervisors who would have testified" on Kuenzel's behalf. While counsel admits that he failed to conduct a thorough preparation for the penalty phase of trial, evidence that more mitigating evidence could have been presented does not provide a basis for a finding that the petitioner is actually innocent of the death penalty. While Goody points to flaws in the investigation, she provides no real evidence that would have been presented. For example, Goody hints that the petitioner may have suffered from some medical condition for which he required treatment; even so, she does not provide any evidence that Kuenzel, in fact, had any medical problems that would have served as a mitigating circumstance. She further mentions that she would have had Kuenzel tested for "organic brain damage, learning disabilities, depression, anxiety or other impairments," but she does not allege, and the facts do not indicate, that any such impairment existed at the time. She hints that Kuenzel's mental capabilities may have been below average, but never alleges that he is mentally retarded. She lists approximately 50 people she claims could have testified at the penalty phase, but offers no specific mitigating fact

to which they could have testified.  She states that "trial counsel could have established that he was a loyal son and brother."  In fact, trial counsel did establish that Kuenzel had been dedicated to his younger step-brother and step-sister, and could be a good father to his son.  At the same time, Goody alleges that Kuenzel is 25% Cherokee, and faults counsel for failing "to establish a relationship with the Cherokee Nation" and "to inquire of the tribe whether or not they would be willing to testify on behalf of a fellow Cherokee native."  She gives no indication as to what mitigating evidence such Cherokee witnesses could have provided.  At best, her statements support claims that counsel rendered ineffective assistance at the sentencing phase of the trial.

Taking together all of the petitioner's evidence relating to his alleged actual innocence of the death penalty, the court finds that it amounts to nothing more than "additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error."  Sawyer, 505 U.S. at 347.  These facts, even if new and credible, are completely insufficient to demonstrate that the petitioner is actually innocent of the death penalty.  Petitioner does not assert that the aggravating factor  – that the murder was committed during an attempted robbery – was not proven at trial.[36]  He has failed to show, by clear and convincing evidence, that no reasonable juror could have found that petitioner is eligible for the death penalty under Alabama law.

---

[36]     Petitioner does argue that no money was taken at the store and that the gun could have gone off unintentionally, but this evidence does not dispute the trial testimony that indicated that Kuenzel had a plan to rob the convenience store, went into the store to rob it while armed with a shotgun, and fired the shotgun when the robbery went awry.  Venn's testimony was sufficient to support the jury's finding that the aggravating factor existed, and that Kuenzel was, therefore, eligible for the death penalty under Alabama law.

## **CONCLUSION**

Accordingly, for the reasons stated above, the court finds that the petition for writ of *habeas corpus* under 28 U.S.C. § 2254 is due to be dismissed with prejudice as time-barred by 28 U.S.C. § 2244(d).  Under the Supreme Court's precedent in Pace and Allen v. Siebert, 552 U.S. 3, 128 S. Ct. 2, 169 L. Ed. 2d 329 (2007), intervening controlling authority regarding the very issue presented here, the meaning of the term  "properly filed" in § 2244(d)(2), the untimely state petition filed by Kuenzel was not a "properly filed application" capable of tolling the limitation period.  Petitioner, represented by counsel, waited until February 2000 to file the instant *habeas* petition, more than three years after the limitation period was enacted in 1996.  The Rule 32 petition pending at the time the AEDPA became law did not act to toll the running of the limitation period under § 2244(d)(2), because it was found to be itself untimely filed under Alabama state law and procedure.  Pace compels the conclusion that the Rule 32 petition, being untimely filed, was not a "properly filed application" within the meaning of § 2244(d)(2) such that it could toll the running of the federal limitation period.

Petitioner has attempted to demonstrate that he should be exempted from the time-bar because he is actually innocent of the crime, or because he is actually innocent of the death penalty. The court must conclude that the evidence he has offered in support of his claim that he is entitled to the actual innocence exception fails to demonstrate either that he is factually innocent of the crime or that he was not eligible for the death penalty under Alabama law.  Accordingly, the time limitation must apply to bar any consideration of the petitioner's claims.

58

By separate order, the court will GRANT the respondents' motion to dismiss the instant petition with prejudice.

DATED this 16th day of December, 2009.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE